**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MURRAY HOOPER,
*Petitioner-Appellant*,

v.

DAVID SHINN,[*] Warden,
*Respondent-Appellee.*

No. 08-99024

D.C. No.
2:98-CV-02164-SMM

OPINION

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, District Judge, Presiding

Argued and Submitted September 16, 2020
San Francisco, California

Filed January 8, 2021

Before: Jacqueline H. Nguyen, Mark J. Bennett, and
Ryan D. Nelson, Circuit Judges.

Opinion by Judge Bennett

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), David Shinn is substituted for his predecessor, Dora B. Schriro, as Warden.

## SUMMARY[**]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Murray Hooper's habeas corpus petition challenging his Arizona state conviction and death sentence for multiple offenses including two counts of first-degree murder.

The panel addressed three certified issues: (1) whether the prosecution's nondisclosure and delayed disclosures of evidence violated Hooper's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963); (2) whether the district court erred in denying Hooper leave to amend his petition to add a claim that his death sentence violates the Eighth and Fourteenth Amendments because his sentence was based, in part, on now-invalid convictions; and (3) whether *Martinez v. Ryan*, 566 U.S. 1 (2012), excuses the procedural default of his claim that his trial counsel rendered ineffective assistance at sentencing.

Analyzing Hooper's *Brady* claims under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the panel held that:

- The Arizona Supreme Court did not unreasonably apply clearly established law in concluding that Hooper failed to show that disclosure of benefits that the State and a county investigator provided to a witness and his wife might have affected the outcome

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

of the trial; that the panel is therefore barred under 28 U.S.C. § 2254(d)(1) from reviewing Hooper's claim based on these benefits; and that the Arizona Supreme Court's determination that the benefits were cumulative impeachment evidence was not an unreasonable factual determination under 28 U.S.C. § 2254(d)(2).

- Because there was no clearly established law governing *Brady* claims based on delayed disclosures where the defense had the opportunity to use the evidence at trial, AEDPA precludes review of the Arizona Supreme Court's decision on Hooper's claim regarding the delayed disclosure of police reports.

- Because there was no clearly established law concerning such delayed disclosures, Hooper's argument that the Arizona Supreme Court's decision on delayed disclosure of photos was an unreasonable application of clearly established law likewise fails; and assuming without deciding that the Arizona Supreme Court's decision on the photos was based on an unreasonable factual determination, the outcome on the *Brady* claims does not change because the claims fail even on de novo review.

The panel wrote that even if it could review all of the *Brady* claims de novo, they would fail because the delay in producing the photos and police reports, and the failure to disclose the benefits to the witness and his wife, were not material, as they would not have put the whole case in such a different light as to undermine confidence in the verdict.

The panel held that the district court properly denied Hooper's request for leave to amend his petition to include claims that his death sentence violates the Eighth and Fourteenth Amendments because any amendment would be futile.

The panel held that Hooper—who did not raise in his first state post-conviction petition his claim of ineffective assistance of sentencing counsel—failed to establish cause under *Martinez* to excuse the procedural default. The panel held that because Hooper failed to show what additional evidence he could have obtained from discovery or an evidentiary hearing to support that he was prejudiced by trial counsel's performance, the district court did not abuse its discretion in denying his requests for discovery and an evidentiary hearing.

The panel declined to expand the certificate of appealability to include two claims as to which it deemed the district court's decision not debatable among reasonable jurists.

## COUNSEL

Thomas J. Phalen (argued), Phoenix, Arizona; Jon M. Sands, Federal Public Defender; Dale A. Baich, Assistant Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Petitioner-Appellant.

Jeffrey L. Sparks (argued), Jon G. Anderson, and John Pressley Todd, Assistant Attorneys General; Kent Cattani, Chief Counsel, Capital Litigation Section/Criminal Appeals Section; Office of the Attorney General, Phoenix, Arizona; for Respondent-Appellee.

# OPINION

BENNETT, Circuit Judge:

In this murder-for-hire case, an Arizona jury convicted Murray Hooper on all counts, including two counts of first-degree murder. The trial court sentenced Hooper to death. On New Year's Eve 1980, while Pat Redmond, his wife Marilyn Redmond, and Marilyn's mother Helen Phelps (who was visiting) were home preparing for a festive dinner, Hooper, William Bracy, and Ed McCall forced their way into the home at gunpoint. Hooper and his coconspirators demanded jewelry, money, and guns. They herded their victims into the master bedroom and forced them to lie face down on the bed. Redmond, Marilyn, and Phelps were then bound and gagged. One or all the intruders shot each victim in the head, and one of the intruders slashed Redmond's throat. Redmond and Phelps died, but Marilyn survived.

Hooper appeals the district court's denial of his petition for a writ of habeas corpus. He raises three certified issues: (1) whether the prosecution's nondisclosure and delayed disclosures of evidence violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963); (2) whether the district court erred in denying him leave to amend his petition to add a claim that his death sentence violates the Eighth and Fourteenth Amendments because his sentence was based, in part, on now-invalid convictions; and (3) whether *Martinez v. Ryan*, 566 U.S. 1 (2012), excuses the procedural default of his claim that his trial counsel rendered ineffective assistance at sentencing. Hooper also raises two uncertified issues: (1) whether he was unconstitutionally shackled at trial; and (2) whether the unconstitutional shackling caused him to involuntarily waive his right to be present at voir dire because it forced him to choose between two constitutional rights.

We have jurisdiction under 28 U.S.C. §§ 1291 and 2253, and we affirm the district court's denial of habeas relief.

## I.  Facts and Procedural History

### A.  The Conspiracy and Murders

Robert Cruz, head of a Chicago crime organization, hired Hooper, Bracy, and McCall to kill Redmond.[1]  Redmond and Ron Lukezic co-owned Graphic Dimensions, a successful Phoenix printing business.  In the summer of 1980, Cruz and Arthur Ross (Lukezic's brother-in-law) offered Graphic Dimensions several lucrative printing contracts with Las Vegas hotels, but Redmond rejected the offers.  Cruz was unhappy and wanted Redmond killed to get Redmond's interest in the business.  His plan was to eventually take over the entire business by having Lukezic killed.

In September 1980, Cruz offered Arnold Merrill $10,000 to kill Redmond, but Merrill refused.  In early December 1980, Hooper and Bracy, who lived in Chicago, flew from Chicago to Phoenix, and Cruz and Merrill picked them up at the airport.  Over the next several days, Merrill drove Hooper and Bracy to various locations.  On one occasion, Merrill took the men to see Cruz, and Merrill saw Cruz give a stack of $100 bills to Bracy, who gave some to Hooper.  That same day Merrill drove the men to the Gun Trader, a gun store owned by Merrill's brother, Raymond Kleinfeld.  Hooper

---

[1] As discussed below, identification was a critical issue in the case. Hooper and Bracy are black, and McCall is white.  Hooper was thirty-five when he committed the Redmond crimes.  Bracy died of natural causes in 2005, *see* Motion to Dismiss, *Bracy v. Schriro*, No. 95-cv-02339 PHX-SSM (D. Ariz. Sept. 7, 2005), ECF No. 94, and McCall is also deceased.

picked out a large knife, paid for by Cruz, and Kleinfeld gave Bracy a package containing three guns.

At some point, Merrill, Hooper, and Bracy spotted Redmond leaving a bar and followed him as he drove away from the bar. During the chase, Hooper held his gun out of the window to shoot Redmond. Merrill sped up and turned into a parking lot to prevent Hooper from shooting Redmond. After this aborted attempt, Hooper and Bracy moved out of Merrill's home and into the apartment of Valinda Lee Harper and Nina Marie Louie, two women Merrill had introduced to Hooper and Bracy. At some point during their trip, Merrill also introduced Hooper and Bracy to McCall. Hooper and Bracy eventually returned to Chicago.

Hooper and Bracy came back to Phoenix on December 30, 1980. That day, at Cruz's direction, Merrill and George Campagnoni drove by Redmond's home and Graphic Dimensions to verify the addresses. The next morning, McCall dropped off Hooper and Bracy at Merrill's home, and Merrill gave Bracy a piece of paper with directions to Redmond's home and Graphic Dimensions. Later that morning, McCall came back for Hooper and Bracy, and the three left Merrill's home. Dean Bauer (Cruz's employee) then came to Merrill's home and dropped off two airplane tickets from Phoenix to Chicago for "Sam Johnson" and "Tony Jones."

That same day, Louie arrived at her apartment around noon. McCall, Hooper, and Bracy were already there. Bracy asked Louie "what time it got dark" and said that they had "some business to take care of." All three men were armed with guns. Louie had to work that night, and Harper borrowed McCall's car to drive Louie to work. Before Harper and Louie left the apartment around 5:45 p.m.,

McCall told Harper that she needed to come back quickly because "they had a very important appointment."

Later that night, Hooper, Bracy, and McCall went to Redmond's home and killed Redmond and Phelps and attempted to kill Marilyn. After the murders, they went to Merrill's home. Around midnight, Campagnoni drove Hooper and Bracy from Merrill's home to the Phoenix airport with the airline tickets for "Sam Johnson" and "Tony Jones."

The day after the murders, McCall went to Harper's and Louie's apartment and told them how the murders had been committed, including describing his role and Hooper's role in committing them. He told them that it was a "contract . . . hit, not [a] robbery" and that Hooper had cut Redmond's throat and shot Marilyn. McCall later detailed the crimes to Merrill and told him that he was expecting $10,000 from Chicago.

## B. The Police Investigation

On New Year's Eve 1980, Officer Louis Martinez responded to a call that there were two or possibly three dead bodies at the address of the Redmond home. When Officer Martinez arrived, he questioned Marilyn who was conscious but "had a very detached look on her face." Marilyn told him, "Three black men came in and robbed us." She initially reported to Officer Thomas Varela, who also questioned her at the scene, that the intruders were all black. But Officer Varela asked if she was sure, and Marilyn then told him that two of the intruders were black and one was white. Later that same night at the hospital, Marilyn reported to Officer Jesus Perez that one of the intruders was white and the other two were black. She also reported that one of the black males was wearing a tan leather jacket with dark pants.

Around 9 p.m., about two hours after the murders, three black men—Ronald Bradford, Michael Bradford, and Novell Ward (collectively, the "Bradfords and Ward")—were arrested on traffic, weapons, and drug charges. Ronald Bradford was very slender and had a wart on his forehead above his nose. Ward was wearing a brown vinyl or leather jacket with a fleece collar at the time of his arrest.

Around 10:05 p.m., while the Bradfords and Ward were in custody, the Maricopa County Sheriff's Office received an anonymous call that a black man named "Slim" with a wart on his nose was involved in the Redmond murders. The caller said that Slim was currently at the corner of 13th and Washington Streets. The police interviewed, photographed, and fingerprinted the Bradfords and Ward, and the police ultimately ruled them out as suspects in the Redmond crimes.

On January 1, 1981, Harper called the police and implicated Hooper, Bracy, and McCall in the murders. During her interview, Harper said that she was with Bracy in Phoenix on New Year's Eve.

On January 4, 1981, officers executed a search warrant on McCall's home and vehicle. They found Long's Drugstore receipts inside his vehicle, showing that three pairs of surgical gloves and adhesive tape had been purchased the same day as the murders. They also found two plastic gloves in a garbage bag at McCall's home.

A fingerprint analyst lifted fingerprints from McCall's vehicle and the Redmond home. The analyst was unable to match any to Hooper, Bracy, McCall, or the Bradfords and Ward.

The State's criminalist analyzed the bullets removed from the victims and found at the crime scene and

determined that they were .38 caliber bullets, and that all had been fired from the same gun. The bullets could have been fired from a Colt Trooper .357 magnum.

Fifty-three days after the murders, Marilyn flew to Chicago to view lineups of Hooper and Bracy. After viewing the first lineup, which included Bracy, Marilyn reserved judgment. After viewing the second lineup with Hooper, Marilyn positively identified Hooper. Marilyn then asked to see the first lineup again, and she identified Bracy.

## C. The Trial

Hooper and Bracy were tried together. Each was charged with conspiracy to commit first-degree murder (Count One), two counts of first-degree murder (Counts Two and Three), one count of attempted first-degree murder (Count Four), three counts of kidnapping (Counts Five to Seven), three counts of armed robbery (Counts Eight to Ten), and one count of first-degree burglary (Count Eleven). Their trial started on October 20, 1982. The jury convicted Hooper and Bracy on all counts on December 24, 1982.

### 1. Hooper's Defense Theory

Hooper's and Bracy's primary defense theory was that they were in Chicago at the time of the murders. They also argued that the prosecution's investigation was improper, mainly because of the improper conduct of the State's investigator, Daniel Ryan. They further argued that the police had wrongly eliminated the Bradfords and Ward as suspects.

Hooper did not testify, but his counsel laid out Hooper's defense in his opening statement. Hooper and Bracy had come to Arizona in early December 1980, but not to kill

Redmond. Cruz and Merrill wanted to take over the South Phoenix drug business, and they brought Hooper and Bracy to Arizona to persuade them to kill the top drug dealers in South Phoenix. Hooper and Bracy refused the job. In an attempt to change their minds, Merrill introduced them to women (Harper and Louie) and took them to the Gun Trader, on Cruz's tab. Cruz also gave them money. But Hooper and Bracy still refused the job and left Arizona.

Cruz, Merrill, Campagnoni, McCall, Harper, and Louie then become "paranoid" that Hooper and Bracy would turn on them by informing the South Phoenix drug dealers about their takeover plans. This motivated the group to frame Hooper and Bracy for the Redmond murders. The group then had McCall pay two unnamed black men to go with him to Redmond's home while McCall committed the murders, and one day later Harper falsely reported to the police that McCall, Hooper, and Bracy had committed the murders.

### 2. The State's Evidence

The prosecution presented overwhelming evidence of Hooper's guilt. The most important witness was Marilyn, as she was the only one who saw the intruders in her home. Marilyn identified Hooper, Bracy, and McCall as the murderers. Her in-court identifications were certain, and she did not waiver when the defense suggested she could be mistaken. The jury also learned that Marilyn had picked Hooper and Bracy out of lineups before trial.

Marilyn provided very specific details about her lengthy encounter with the murderers. Marilyn explained that they gave her directions and asked her several questions. She looked at their faces each time they spoke to her. At one point during the encounter, she was positioned "[e]lbow to elbow" with Hooper and she looked at him. She described

the clothing that each murderer wore. Bracy was wearing a tan leather jacket, dark slacks, and a dark shirt. Hooper was wearing a darker brown sports or leather coat and dark slacks. McCall was wearing a light tan suit.

Marilyn testified that the men forced their way into the home at gunpoint. Bracy directed her to hold the family dog and close the drapes, and she complied. The intruders demanded jewelry and money and asked if there was a safe or any guns in the home. She gave Bracy the jewelry she was wearing, told them there was a gun in the nightstand, and showed Hooper the guns in the hall closet. Redmond gave them his watch and ring, and one of the intruders grabbed Phelps's wedding ring as she tried to hide it under a pillow. All three victims were eventually told to lie on the bed, and Hooper taped their hands behind their backs. Hooper then gagged all three using socks. Marilyn heard McCall say, "[W]e don't need these two anymore," and then she heard two shots. That was the last thing she remembered before waking up.

The defense tried to discredit Marilyn by pointing out inconsistencies between her testimony and prior statements. For example, Marilyn initially reported to some witnesses that the intruders were all black and that two wore masks. Marilyn testified that she did not recall making the prior statements or that they were wrong or had been misinterpreted. The defense also tried to cast doubt on Marilyn's lineup identifications by, among other things, suggesting that the State's investigator, Ryan, had shown her pictures of Hooper and Bracy before the lineups. Marilyn testified that did not happen.

The defense presented an expert on human perception and memory who testified that people make more mistakes when they try to identify a person of a different race and that

violent events are more poorly stored in people's memories. On cross-examination, however, the expert conceded that she could not opine on whether Marilyn experienced any cross-racial identification problems. And the prosecutor elicited testimony showing that Marilyn was skilled at recognizing faces. She testified that she had worked as a sales receptionist for seven years and was like a "visual Rolodex" for the company.

Louie was also an important witness. She testified that she met Hooper and Bracy in early December 1980 in Phoenix. She overheard Bracy say that "he had a big job to do" for $50,000 and "it wasn't going to be very pretty." Bracy told her that he and Hooper would return to Phoenix on New Year's Eve.

On New Year's Eve, Louie saw Hooper, Bracy, and McCall at her apartment. McCall was wearing a suit, Bracy and Hooper were wearing slacks and dark shirts, and one of them had a brown leather jacket. She testified that all three were armed with guns, and Hooper had a large gun "similar to a .357 magnum or a large-barrel .38." Bracy asked her what time it got dark and said that they had "some business to take care of." McCall let Harper use his car to drive Louie to work that night. McCall told Harper that she needed to come back quickly because "they had a very important appointment."

The next day, McCall came to Louie's apartment and discussed the Redmond crimes. While watching the news, McCall corrected the newscaster by stating that Marilyn was not shot in the face but in the back of the head, like the other two; the victims were not tied up, but were taped; and only Redmond's throat had been slashed. He said that Hooper was the one who had shot Marilyn and cut Redmond's

throat. McCall stated that it was a "professional job" and a "contract . . . hit, not [a] robbery," and that they wore gloves.

The State presented evidence corroborating parts of McCall's statements to Louie. It offered the two Long's Drugstore receipts found in McCall's vehicle, showing that three pairs of gloves and tape had been purchased on the day of the murders. A Long's Drugstore employee testified that two men, one black and one white, bought three pairs of gloves and adhesive tape on the day of the murders. Redmond's neighbors reported that a vehicle matching the description of McCall's car had been near the Redmond home around the time of the murders.

Other evidence also corroborated Louie's testimony. An officer testified that Harper had called the police the day after the murders and implicated Hooper, Bracy, and McCall in the Redmond murders. The jury also learned that in a later police interview, Harper said that she was with Bracy in Phoenix on New Year's Eve.[2]

Campagnoni testified that he saw Hooper and Bracy at Merrill's home on New Year's Eve. He saw Merrill give Bracy a piece of paper with directions to the Redmond home and Graphic Dimensions. Campagnoni testified that after Hooper and Bracy left, Bauer came to Merrill's home and dropped off airline tickets with the names "Sam Johnson" and "Tony Jones."

Campagnoni next saw Hooper, Bracy, and McCall later that evening when they returned to Merrill's home. The three had jewelry, some of which looked very similar to a ring and watch owned by Redmond. Campagnoni drove

---

[2] Harper did not testify because she could not be found.

Hooper and Bracy to the airport that night around midnight. Bracy had the airline tickets that Bauer had dropped off earlier, and Bracy told Hooper that he would be "Tony Jones" and Hooper would be "Sam Johnson."

Merrill also testified. He described the origin of and motive for the plan to kill Redmond, including that he had refused Cruz's offer to kill Redmond for $10,000. Merrill provided many details about Hooper's and Bracy's first trip to Arizona in early December 1980. He said that he and Cruz picked up Hooper and Bracy from the Phoenix airport. During early December: he saw Cruz give Bracy a stack of money, which Bracy shared with Hooper; he took the men to the Gun Trader where they picked up three guns and Hooper picked out a knife, which was paid for by Cruz and looked like the same knife found at the crime scene; Merrill, Hooper, and Bracy followed Redmond from a bar called Chester's Lounge, Hooper pointed his gun out the car window to shoot Redmond, but Merrill stopped Hooper from firing by turning into a parking lot; and after the chase, Hooper and Bracy moved from Merrill's home into Harper's and Louie's apartment.

Merrill testified that, on December 30, 1980, Cruz instructed him to tell McCall to pick up Bracy and Hooper from the Phoenix airport and to pick up a package from the Gun Trader. That same day, at Cruz's direction, Merrill and Campagnoni verified the addresses for the Redmond home and Graphic Dimensions. The next morning, McCall dropped off Hooper and Bracy at Merrill's home. McCall came back later that morning and left with Hooper and Bracy. Bauer came to Merrill's home in the afternoon and dropped off two American Airlines tickets from Phoenix to Chicago.

Merrill testified that Hooper, Bracy, and McCall came to his home around 8:30 p.m. on New Year's Eve. They had with them several items that might have come from the Redmond home, including a watch, ring, and gun holster. Several days later, McCall told Merrill that he, Hooper, and Bracy had committed the Redmond crimes. McCall told Merrill that he was expecting a payment of $10,000 from Chicago for the murders.

Merrill was severely impeached. Most significantly, the jury learned that he had received a deal from the State giving him immunity for the Redmond crimes, including the first-degree murders of Redmond and Phelps for which he could have received the death penalty, as well as immunity for unrelated crimes.[3] Thus, the jury knew Merrill had a very strong personal stake in the case and motive to lie. The defense also showed that Merrill had received special treatment from the State and Ryan: Merrill was placed in a more inmate-friendly, out-of-state prison as part of his deal; Ryan did not immediately arrest him in New York even though he was wanted for first-degree murder; Ryan allowed him to travel unrestrained from New York to Arizona despite being a wanted murderer; and Ryan took Merrill out of jail for a conjugal visit.

The defense also cast significant doubt on Merrill's credibility by showing that Ryan had stopped his tape-recorded interview with Merrill more than twenty times. Neither Merrill nor Ryan could provide any plausible explanations for the interruptions, and the defense persuasively argued that Ryan must have paused the tapes to coach Merrill on what to say. The defense gave the jury

---

[3] As part of his plea deal, Merrill pleaded guilty to an unrelated burglary and theft and received an eight-year sentence.

many other reasons to discredit Merrill's testimony: he had previously lied to the police in this case and had initially helped cover up the crimes; he was part of a group that committed burglaries and robberies, and he had sold stolen property; he had hired someone to commit arson for Cruz; he was a drug dealer and had a long history of abusing prescription medications; and Merrill's friend, Campagnoni, testified that Merrill was a braggart, and even Merrill's own brother, Kleinfeld, testified that he was a "story teller, liar, [and] bragger."

The defense further impeached Merrill by highlighting many inconsistencies between his testimony and his prior statements. For example: Merrill testified that he did not get together with Campagnoni to make up a story, but Merrill had previously stated that he told Campagnoni to deny to the police that any black individuals had been at his home; Merrill testified that the bullets he threw away in a canal could not have been the same type that killed Redmond, but he previously testified that they could have been; and he testified that he was not the leader of a criminal group, which contradicted his prior testimony. Parts of Merrill's testimony also contradicted other evidence, giving the jury even more reasons to disbelieve him. For example, Kleinfeld testified that Merrill picked out the knife at the Gun Trader, not Hooper, and Campagnoni testified that Merrill gave Bracy .38 caliber ammunition on New Year's Eve, but Merrill denied giving any bullets to Hooper, Bracy, or McCall.

The State's case included evidence beyond the testimonies of Marilyn, Louie, Campagnoni, and Merrill. Several other witnesses testified about the motive for the killings. Graphic Dimensions employees testified that they had seen Cruz touring Graphic Dimensions around mid-

1980.  William Michael Tompkins, a pilot whom Cruz had hired on occasion, testified that during the summer of 1980 he overheard Cruz say that he wanted to take over a printing business to launder money and that he was "going to have to get rid of" the uncooperative business partner.

Tompkins also testified that, around December 28, 1980, Cruz had asked him to rent a private plane because the same two black men who had been in Phoenix in early December were coming back to Phoenix and did not want to fly commercial.  Cruz, however, called Tompkins the next night and told him to cancel the plane because the men had decided to fly commercial.  Bauer testified that on December 31, 1980, at Cruz's direction, he purchased two one-way tickets from Phoenix to Chicago on the red-eye flight that left at 2:00 a.m.  Bauer testified that he delivered the tickets to Merrill's home at Cruz's direction.  The State's evidence included the two one-way tickets, and an airline representative testified that the tickets had been used.  This corroborated that Hooper and Bracy were in Phoenix on New Year's Eve.

Telephone records further supported that Hooper and Bracy were then in Phoenix, not Chicago.  The records showed that, on December 31, 1980, two phone calls were made from Merrill's home in Phoenix to Ann Harris's home in Chicago (Harris was the mother of Hooper's then-girlfriend).  Other records showed that Bracy made calls from his home in Chicago to Cruz's home in Illinois and the Gun Trader in the days before the murders.  No calls were made from Bracy's home to Cruz's Illinois home on the day of the murders, but the calls from Bracy's home to Cruz's Illinois home resumed immediately after.  The State argued that these telephone records showed that Bracy and Hooper were in Phoenix on the day of the murders.

The jury learned about evidence from which it could infer that Hooper possessed both the murder weapon and the knife that was used to slash Redmond's throat. The bullets removed from the victims had been fired from the same weapon, which could have been a Colt Trooper .357 magnum. Kleinfeld testified that he sold three guns to Cruz in December 1980, including a .357 Colt Trooper and .22 Ruger, and that McCall had picked up those two guns at the Gun Trader around December 30, 1980, the day before the murders. Louie testified that on the day of the murders, Hooper was with McCall and had a gun similar to a .357 magnum. Kleinfeld also testified that around early December 1980, Merrill, Hooper, and Bracy had come to the Gun Trader and left with a knife that was the same or very similar to the knife found at the crime scene, which had been used to cut Redmond's throat.

### 3. Evidence Relating to the Bradfords and Ward

During the defense's cross-examination of Detective Ronald Quaife, the jury learned that three black men, the Bradfords and Ward, had been arrested on the night of the murders for traffic, weapon, and drug charges. Detective Quaife described Ronald Bradford as slender and having a wart above his nose. He stated that Ward had been wearing a brown leather or vinyl jacket at the time of his arrest. He also testified about the anonymous call made to the Sheriff's Office around 10:05 p.m. while the Bradfords and Ward were in custody. Detective Quaife said the caller reported that a black male matching the description of Ronald Bradford had committed the Redmond crimes. He explained that the Bradfords and Ward were ruled out as suspects based on the temporal proximity between the murders and their arrests.

During redirect of Detective Quaife, the prosecutor asked about photos that had been taken of Ronald Bradford. From this questioning, the defense realized that the prosecution had withheld arrest photos of the Bradfords and Ward. They then moved for a mistrial. The court denied the mistrial motion but granted the defense's motion to exclude Detective Quaife's testimony about the photos as improper redirect exceeding the scope of cross-examination. The court then instructed the jury to disregard any reference to the photos.

The next day, the defense learned through Officer Michael Midkiff's testimony that the prosecution may have failed to disclose all the police reports on the Bradfords and Ward. Hooper moved for a mistrial based on this purported failure, and the court conducted a brief hearing. Later that day, the court resumed the hearing on the mistrial motion based on the alleged undisclosed reports. During the hearing, Bracy's counsel informed the court that he would be moving for some of the photos of the Bradfords and Ward to be admitted. Presumably, the photos had been provided to the defense by this time. The photos included color photographs taken from different angles and showed what they were wearing when arrested. The court ultimately denied the mistrial motion. But as a remedy, it ordered that the two detectives who had interviewed the Bradfords and Ward be available to the defense for interviews.[4]

About five days later, while the State was still presenting its case, the prosecution provided the undisclosed reports on

---

[4] We are unable to discern from the record whether the defense interviewed these two detectives.

the Bradfords and Ward to the defense.[5]  The defense was provided the undisclosed photos of and reports on the Bradfords and Ward at least three weeks before Hooper presented his defense.

The State used the photos during Marilyn's direct examination.  Though the photos had not yet been admitted, the prosecutor showed Marilyn the photos of the Bradfords and Ward, and she testified that she did not see these men on New Year's Eve.

The photos were later admitted through Hooper's first witness, Detective Quaife.  During cross-examination, the prosecutor successfully, and without objection, admitted the photos.  On redirect, the court granted Hooper's request that the photos be published to the jury.

Hooper also used the undisclosed reports in questioning Detective Quaife.  During Hooper's direct examination, the jury learned that Detective Quaife had been asked by the prosecution during the trial to look for arrest records on the Bradfords and Ward and that Detective Quaife had found them.  Detective Quaife testified that, based on these records, he learned that the Bradfords and Ward had been arrested at 9 p.m. at a location about twenty minutes from the Redmond home.  The defense drew out other details based on the reports, which called into doubt the reasons the police had discounted the Bradfords and Ward as suspects for the Redmond crimes.

---

[5] Before trial, the prosecution had disclosed police reports that mentioned some of the circumstances of the arrests of the Bradfords and Ward as well as the anonymous call.  The undisclosed reports revealed more detail about the circumstances of the arrests.

The jury also learned more details about the anonymous call through the prosecutor's cross-examination of Detective Quaife. The caller said that he had seen the newscast of the homicides and that one of the persons involved was at 13th Street and Washington. The caller said that the person involved was a black male named "Slim" and that Slim had a wart on the side of his nose.

### 4. Defense Evidence

The defense put on evidence showing that the State's investigator, Ryan, used improper investigatory tactics and engaged in other improper conduct. For example, Kleinfeld testified that Ryan had threatened to break his legs if he did not tell him what he wanted to know. Wally Roberts, who worked with Graphic Dimensions, testified that Ryan had given him cash and told him not to cooperate with the defense and to lie to the police. The jury also learned that Ryan had provided false answers to Campagnoni's presentence report writer to help Campagnoni obtain a lighter sentence.

Hooper and Bracy presented several alibi witnesses. Hooper's witnesses included Mary Jean and Michael Wilson, two friends of Hooper's brother, who testified that they had seen and spoken with Hooper on the day of the murders at a flea market in Chicago. Nelson Booker, another friend of Hooper's brother, testified that he had seen and spoken with Hooper at a New Year's Eve party at a Chicago club.

### 5. Closing Arguments and Verdict

The prosecutor's closing argument reviewed all the evidence. The prosecutor discussed the evidence supporting the motive for Redmond's murder, including the various

witnesses who knew about the potential Las Vegas business and Tompkins's testimony that Cruz said one of the business partners had to be eliminated. He highlighted Marilyn's testimony about the details of the crimes, her pretrial identifications, and her confident in-court identifications of Hooper and Bracy as the killers. The prosecutor also discussed the testimonies of Merrill, Kleinfeld, Tompkins, Bauer, Campagnoni, Louie, and the Long's Drugstore employee. He reminded the jury about the gloves and receipts found in McCall's home and vehicle, the plane tickets bought by Bauer, and the telephone records.

Hooper's counsel maintained during closing that Hooper was in Chicago at the time of the murders. He argued that the testimonies of Merrill, Campagnoni, Louie, and Marilyn were unreliable. He pointed out that Merrill had to stick to his story, which was a lie, because "[i]f he change[d] it now, he [could] be tried for first degree murder and sent to death row." Hooper's counsel also emphasized the information in the undisclosed reports, arguing that the officers' reasons for discounting the Bradfords and Ward as suspects were not believable and that there was more evidence connecting them to the Redmond crimes than there was against Hooper.

Hooper's counsel did not focus on the photos. The prosecution, however, specifically asked the jury to compare the photos to Marilyn's descriptions of the intruders. Bracy's counsel did not mention the Bradfords or Ward in his closing statement.

The jury deliberated for three days and found both defendants guilty as charged on all eleven counts, including the two first-degree murder counts.

## D. Sentencing

Hooper's prior convictions were relevant for sentencing purposes, and on January 6, 1983, the court held a hearing as to those convictions. Hooper's trial counsel, Grant Woods, was not present, and Allen Gerhardt, another public defender, appeared instead. The State presented evidence that Hooper had been convicted on September 23, 1981, in Illinois, on three counts of first-degree murder, three counts of armed robbery, and three counts of aggravated kidnapping, and the court so found later during Hooper's sentencing.

Before the hearing on aggravating and mitigating circumstances under Arizona's death statute, A.R.S. § 13-703 (1982),[6] the prosecutor notified Hooper's counsel that the State intended to call one Phoenix officer and two Chicago officers to testify at the aggravation and mitigation hearing. The prosecutor stated that the officers would testify about these statements made by Hooper: "They (the people in Phoenix) thought Bracy was high-class, and me a low-class dog. But those people in Phoenix weren't that sharp, they gave me $10,000 for killing Redmond and his family and I would have done it for a couple hundred dollars a person"; "I can't handle myself out of the pen, can't even get a driver's license, most of the time I'm just drunk. I'm better off dead or in the pen because if I got out again I would

---

[6] All citations to A.R.S. § 13-703 refer to the version in effect in 1982.

probably just kill someone again"; and "I like to shoot people, it doesn't bother me a bit."[7]

On February 4, 1983, the court conducted the aggravation and mitigation hearing. Gerhardt also represented Hooper at this hearing. The parties received copies of Hooper's presentence report ("PSR") on the day of the hearing, and before the start of the hearing, the court granted a recess to allow counsel to review the PSR. The PSR showed that Hooper, born in 1945, had a long adult criminal history, starting when he was eighteen. Hooper started out with a disorderly conduct conviction in 1963 and then progressed to robbery and armed robbery convictions. In 1969, he was charged with murder but pleaded guilty to manslaughter. In 1977, he was convicted of attempted murder. As noted, Hooper was convicted in Illinois in 1981 of three counts of first-degree murder, three counts of armed robbery, and three counts of aggravated kidnapping, for crimes committed in November 1980.

The prosecutor asked the court to find the existence of aggravators based on the evidence in the record and Hooper's 1981 Illinois convictions. The prosecutor did not bring up the details of Hooper's other criminal convictions or his admissions, but the court was aware of this information because it was in the PSR and in the supplemental PSR. Hooper's counsel presented no evidence.

---

[7] As far as we can tell from the record, the State did not present these admissions at trial because it agreed not to use them after Hooper moved for their suppression. These admissions were disclosed to the trial judge in a supplemental presentence report after the aggravation and mitigation hearing but before sentencing.

Woods and Gerhardt appeared at Hooper's sentencing on February 11, 1983. Woods pleaded for mercy, urging the judge that he should not "order a murder" and that a death sentence was unnecessary because Hooper had already been sentenced to death by an Illinois state court.

The court sentenced Hooper to life imprisonment on Count One, and multiple consecutive sentences of thirty-five years for Counts Four through Eleven. As to Counts Two and Three for the first-degree murders of Redmond and Phelps, the court determined that the State had established five of the seven statutory aggravating factors under Arizona's death statute:

(1) Hooper had a prior conviction for which a life sentence or death was imposable under Arizona law. *See* A.R.S. § 13-703(F)(1). The court found that Hooper's three first-degree murder 1981 convictions in Illinois satisfied this factor.

(2) Hooper had a prior felony conviction involving the use or threat of violence on another person. *See* A.R.S. § 13-703(F)(2). The court found that Hooper's three armed robbery and three aggravated kidnapping 1981 convictions in Illinois satisfied this factor.

(3) Hooper knowingly created a grave risk of death to people other than the victims in the instant offense. *See* A.R.S. § 13-703(F)(3). The court found this factor established by the fact that Marilyn had been placed in a position of grave risk of death given the manner in which the crimes had been committed.

(4) Hooper committed the offense in expectation of receiving something of pecuniary value. *See* A.R.S.

§ 13-703(F)(5). The court found this factor established by the fact that Hooper and his coconspirators were to receive money, or did receive money, for the contract killing of Redmond.

(5) Hooper committed the offenses in an especially heinous, cruel, or depraved manner. *See* A.R.S. § 13-703(F)(6). The court found this factor established given the manner in which the crimes had been committed. Redmond was "shot twice in the head at close range after having been bound and gagged," and, after the shots were fired, his "throat was cut from ear to ear with a large butcher-type knife." Phelps was "bound, gagged, [laid] across the bed and shot at close range with a high caliber pistol," and she "did not die from the first wound and was shot a second time."

The court noted that Hooper presented no mitigating evidence and determined that Hooper had failed to establish the existence of any of the statutory mitigating factors. The court concluded, "Based upon the findings of those five aggravating circumstances, and the fact that there are no mitigating circumstances sufficiently substantial to call for leniency; as to Counts II and III, it is ordered that [Hooper is] sentenced to die . . . ."[8]

---

[8] At the time of Hooper's sentencing, Arizona law required the trial judge (rather than a jury) to determine the existence of aggravating circumstances. *See* A.R.S. § 13-703(B). The Supreme Court later held that this process is unconstitutional in *Ring v. Arizona*, 536 U.S. 584, 609 (2002). But *Ring* does not apply retroactively. *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

## E. Procedural History

### 1. Direct Appeal

On June 10, 1985, the Arizona Supreme Court affirmed Hooper's convictions and sentence. *State v. Hooper*, 703 P.2d 482 (Ariz. 1985) (en banc). We discuss the relevant portions of the decision—those concerning the alleged *Brady* violations and Hooper's death sentence.

The Arizona Supreme Court analyzed five alleged *Brady* violations. *Id.* at 494 (explaining that Hooper's constitutional arguments were addressed in the companion decision in *State v. Bracy*, 703 P.2d 464 (Ariz. 1985) (en banc), decided the same day). Three of those alleged violations are at issue: (1) the delayed disclosure of the photos of the Bradfords and Ward; (2) the delayed disclosure of the police reports on the Bradfords and Ward; and (3) undisclosed benefits that the State and Ryan provided to Merrill and his wife. *Bracy*, 703 P.2d at 471.

As for the photos, the Arizona Supreme Court found that defense counsel objected to their admission, and the trial court excluded them and instructed the jury to disregard them. *Id.* at 472. Given those facts, the Arizona Supreme Court concluded that "either [the] photographs were not exculpatory or defense counsel did not want them in evidence for some other reason" and "defendant did not suffer prejudice from the nondisclosure of this evidence." *Id.*

The Arizona Supreme Court found that the police reports were disclosed "during trial and defendant made use of [them]." *Id.* Given this, the court determined that there was no *Brady* violation as to the police reports. *Id.*

The defense had been informed prior to trial of certain benefits the State and Ryan provided to Merrill. Other such benefits came to light only after trial. *Id.* at 471. These undisclosed benefits were:

> 1) Prior to trial, Dan Ryan, county attorney investigator, made car payments for Arnold Merrill's wife, Cathy Merrill, totaling over $800.00 for which Ryan received only partial reimbursement;
>
> 2) Mrs. Merrill also received approximately $3,000 from the Maricopa County Attorney's Protected Witness Program; [and]
>
> 3) Arnold Merrill made approximately twenty-two long distance phone calls from the county attorney's office, some of which were with Dan Ryan's knowledge, others of which Merrill made while left unattended in Ryan's custody, and none of which he paid for.

*Id.* For convenience, we refer to these benefits discovered after trial as the "Merrill benefits."

Applying *Brady*, the Arizona Supreme Court determined that the Merrill benefits were favorable to Hooper and had been suppressed. *Id.* at 472. In analyzing *Brady* "materiality," the court determined that the Merrill benefits had been specifically requested by the defense. *Id.* Thus, under *United States v. Agurs*, 427 U.S. 97 (1976), the evidence fell within the category of undisclosed evidence that had been specifically requested by the defense, and materiality turned on "whether the suppressed evidence

might have affected the outcome of the trial." *Bracy*, 703 P.2d at 472 (citing *Agurs*, 427 U.S. 97).

Applying that standard, the Arizona Supreme Court found that the Merrill benefits were not material for two reasons. First, the evidence was "merely cumulative" of the "wealth of impeaching evidence against Arnold Merrill." *Id.* at 473. "Such evidence included Merrill's plea bargain with the state; his extensive drug use; his past participation in arson, burglary, kidnapping, and robbery; his past lies to police officers; and his private out-of-jail visit with his wife while being incarcerated for first degree murder." *Id.* Given this "wealth of impeaching evidence," the Arizona Supreme Court reasoned that it did "not believe the disclosure of benefits equaling several thousand dollars would have had any effect upon the outcome of the trial." *Id.*

Second, the court considered the Merrill benefits in light of the other evidence produced at trial and determined that the evidence would not have affected the outcome. *Id.* The court noted that Marilyn gave "strong eyewitness testimony" and that the Merrill benefits, which could have been used to impeach Merrill and Ryan, "had no effect upon [Marilyn's] key testimony." *Id.* Additionally, Merrill's testimony was "not pivotal," as several other witnesses "showed defendant's presence in Phoenix in early and late December, his connection to Robert Cruz, and his participation in Cruz's conspiracy to kill Pat Redmond." *Id.*

The Arizona Supreme Court found no *Brady* violation: "[W]e do not believe that three additional pieces of impeaching information regarding Arnold Merrill might have affected the jury's belief in Mrs. Redmond and the other evidence. Nor would it have had any effect on whatever opinion the jury had of Merrill's credibility." *Id.*

Regarding Hooper's death sentence, the court independently reviewed the record and vacated one aggravating circumstance found by the sentencing court—that Hooper created a grave risk of death to Marilyn under A.R.S. § 13-703(F)(3)—and upheld the remaining four aggravating circumstances. *Hooper*, 703 P.2d at 494–95; *see also Bracy*, 703 P.2d at 481. The Arizona Supreme Court then determined that there were no mitigating circumstances and concluded that Hooper's death sentence was proper. *Hooper*, 703 P.2d at 495.

### 2.  State Habeas Petitions

From 1986 through 2017, Hooper filed five state post-conviction petitions. The Arizona Supreme Court summarily denied the first four petitions and, as of the time Hooper filed his replacement opening brief in our court, the fifth remained pending. We discuss his state petitions relevant to this appeal.

Philip Seplow was appointed to represent Hooper in his first state petition, filed in 1986. Seplow also represented Hooper in his second state petition, filed in 1992. In this second proceeding, Seplow alleged that *he* had been ineffective for failing to raise an ineffective assistance of counsel claim in Hooper's first post-conviction proceeding based on trial counsel's (Woods) failure to present mitigation evidence at sentencing. The post-conviction court denied the second petition and determined that Hooper's ineffective assistance of sentencing counsel claim was procedurally barred. The Arizona Supreme Court summarily denied Hooper's petition for review.

In his fourth petition, filed in 1999, Hooper argued that his death sentence was unconstitutional because it was based in part on his 1981 Illinois convictions, which were likely

invalid. On October 19, 2005, the post-conviction court rejected this argument because, at the time, the Illinois convictions remained valid. Alternatively, the post-conviction court found that, even assuming the Illinois convictions were invalid, Arizona law required a death sentence because there were still two valid aggravating circumstances and no mitigating circumstances.

Hooper petitioned the Arizona Supreme Court for review, arguing that a death sentence based on invalid convictions violates the Eighth Amendment. Though Hooper's petition mentioned the Fourteenth Amendment, he did not raise a due process argument based on his Illinois convictions. And when Hooper supplemented his petition by providing the Arizona Supreme Court with a citation to *Brown v. Sanders*, 546 U.S. 212 (2006), he still did not allege a due process violation. On April 20, 2006, the Arizona Supreme Court summarily denied his petition.

### 3.  Federal Habeas Petition

In 1998, Hooper filed the federal habeas petition that led to this appeal. His supplemental petition included a claim that his death sentence violated the Eighth and Fourteenth Amendments because it was based on the likely invalid Illinois convictions. The district court found that this claim was unexhausted, ordered Hooper to withdraw it, and entered a stay pending exhaustion of the claim. After waiting more than five years, the district court vacated the stay but determined that Hooper could move for leave to amend his habeas petition once he exhausted his claim in state court.

In 2006, having purportedly exhausted that claim, Hooper sought leave to amend his petition to add it. The district court denied Hooper's motion to amend, finding that

the claim was meritless and thus amendment would be futile. The district court also denied Hooper's claim that his trial counsel had provided ineffective assistance at sentencing by failing to investigate and present mitigation evidence. The district court determined that the claim was procedurally defaulted because Hooper had failed to present it in his first state post-conviction petition.

The district court ultimately denied Hooper's petition in 2008. In its order denying the petition, the district court analyzed thirteen alleged *Brady* violations, including, as relevant here, the delayed disclosures of the photos and police reports and the nondisclosure of the Merrill benefits. In analyzing the Arizona Supreme Court's decision on the *Brady* claims, the district court determined the clearly established law for purposes of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was *Brady*, *Agurs*, and *United States v. Bagley*, 473 U.S. 667 (1985).

Applying that clearly established law, the district court found that the Arizona Supreme Court's denial of the *Brady* claims based on the photos was not objectively unreasonable because the photos were not admitted at trial. It also found that the Arizona Supreme Court's decision regarding the police reports was not objectively unreasonable because Hooper used the reports during trial. The district court determined that the Arizona Supreme Court's decision that the Merrill benefits were immaterial was not contrary to or an unreasonable application of Supreme Court precedent. The district court granted a certificate of appealability on the *Brady* claims, and Hooper timely appealed.

In 2012, Hooper moved to stay the appeal and remand the case pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). He also requested a remand for the district court to reconsider its denial of leave to amend. A motions panel of

this court granted both requests. In part, the panel believed remand appropriate because, while his case was pending on appeal, the United States District Court for the Northern District of Illinois had granted habeas relief to Hooper and vacated his 1981 Illinois convictions.[9]

On remand, the district court again denied relief on the two remanded issues. It denied the ineffective assistance of sentencing counsel claim as procedurally barred, as Hooper failed to demonstrate "cause" under *Martinez* to excuse the procedural default. The court again denied Hooper's request to amend the petition to include the Eighth and Fourteenth Amendment claim because it was meritless and therefore any amendment would be futile. Finally, the district court granted Hooper's request to expand the record with the materials attached to his supplemental briefs submitted on remand, denied his requests for discovery and an evidentiary

---

[9] In 2013, the Seventh Circuit vacated the Illinois district court's denial of Hooper's habeas petition. *Hooper v. Ryan*, 729 F.3d 782, 787 (7th Cir. 2013). The court determined that the Illinois Supreme Court had unreasonably applied *Batson v. Kentucky*, 476 U.S. 79 (1986). 729 F.3d at 787. The court remanded the case to the district court for an evidentiary hearing and an independent *Batson* determination as to what had occurred at the trial, thirty-two years before. *Id.*

On remand, the prosecution declined an evidentiary hearing, and so the district court granted the writ and vacated the Illinois convictions and life sentences (the Governor of Illinois had commuted all Illinois death sentences, including Hooper's). Final Judgment, *Hooper v. Ryan*, No. 10-CV-01809 (N.D. Ill. Dec. 16, 2013), ECF. No. 81; *see also People ex rel. Madigan v. Snyder*, 804 N.E.2d 546, 550, 560 (Ill. 2004) (denying writ of mandamus challenging then-Governor's grant of blanket clemency to over 160 inmates who had been sentenced to death). Illinois has not retried Hooper.

hearing, and granted a certificate of appealability on both remanded issues.

Hooper filed a timely amended notice of appeal.

## II.  STANDARD OF REVIEW

We review the district court's denial of a habeas petition de novo. *Reis-Campos v. Biter*, 832 F.3d 968, 973 (9th Cir. 2016). This case is governed by AEDPA. *See Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004). Thus, we may not grant habeas relief with respect to any claim adjudicated on the merits in state court unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

A state-court decision is contrary to Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law" or "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). "A decision involves an 'unreasonable application' of clearly established federal law under § 2254(d)(1) if it 'identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case.'" *Vega v. Ryan*, 757 F.3d 960, 965 (9th Cir. 2014) (per curiam) (alteration in original) (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be

objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citation omitted).

"[C]learly established Federal law" under AEDPA includes only the Court's decisions as of the time of the relevant state-court adjudication on the merits. *See Greene v. Fisher*, 565 U.S. 34, 38 (2011). "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004). Moreover, "[w]hen a state court has applied clearly established federal law to reasonably determined facts in the process of adjudicating a claim on the merits, a federal habeas court may not disturb the state court's decision unless its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn v. Kayer*, 592 U.S. ----, 2020 WL 7327827, at *1 (2020) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

When a district court denies leave to amend based on a determination that the proposed claim would be futile, we review the determination of futility de novo. *Murray v. Schriro*, 745 F.3d 984, 1015 (9th Cir. 2014). We also review de novo a district court's procedural default determinations. *Runningeagle v. Ryan*, 825 F.3d 970, 978 (9th Cir. 2016).

## III.  DISCUSSION

We first address the three certified issues:  (1) whether nondisclosure of the Merrill benefits and delayed disclosures of the photos and reports violated Hooper's due process rights under *Brady*[10]; (2) whether the district court erred in denying him leave to amend his petition to add a claim that his death sentence violates the Eighth and Fourteenth Amendments because his sentence was based in part on invalid Illinois convictions; and (3) whether *Martinez* excuses the procedural default of his ineffective assistance of sentencing counsel claim.  We then address the two uncertified issues:  (1)  whether  Hooper  was unconstitutionally shackled at trial; and (2) whether the unconstitutional shackling caused him to involuntarily waive his right to be present at voir dire because it forced him to choose between two constitutional rights.  We construe Hooper's briefing on these uncertified issues as a request to expand the certificate of appealability (COA).  *See* Ninth Circuit Rule 22-1(e).

### A.  *Brady* Claims

The last state-court adjudication on the merits of Hooper's *Brady* claims is the Arizona Supreme Court's

---

[10] Although Hooper alleged thirteen *Brady* violations in the district court, he discusses only the photos, police reports, and Merrill benefits in his briefs.  And he fails to present any argument that any alleged nondisclosures, other than those three, were material under *Brady*.  The State argues in its answering brief that Hooper abandoned all of his *Brady* claims other than the three he discusses in his opening brief, and Hooper does not dispute this argument in his reply brief.  Accordingly, Hooper has preserved only the *Brady* claims as to the photos, police reports, and Merrill benefits.  *See Petrocelli v. Angelone*, 248 F.3d 877, 880 n.1 (9th Cir. 2001) (holding that a petitioner in a capital case abandoned several claims for lack of argument supporting the claims).

decision on direct appeal. *See Hooper*, 703 P.2d at 494; *see also Bracy*, 703 P.2d at 471–74. The decision was issued on June 10, 1985, and thus clearly established law includes only the Supreme Court decisions issued by that date. *See Greene*, 565 U.S. at 38. Because *Bagley*, 473 U.S. 667, was issued on July 2, 1985, it was not clearly established.[11] Thus, the district court erred in relying on *Bagley*.[12]

The clearly established law at the time of the Arizona Supreme Court's decision was *Brady*, 373 U.S. 83 (1963), and *Agurs*, 427 U.S. 97 (1976). *Brady* established the three elements of a due process violation based on the suppression of evidence: (1) the evidence is favorable to the accused, (2) the prosecution suppressed the evidence, and (3) the evidence is "material." 373 U.S. at 87. In *Agurs*, the Court differentiated between three nondisclosure situations to which *Brady* applies: (1) where the undisclosed evidence shows "that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury," 427 U.S. at 103, (2) where the defense makes a specific request, and the prosecutor fails to provide responsive evidence, *id.* at 104, and (3) where the defense makes a general request or no request, and the prosecutor suppresses favorable evidence, *id.* at 106–07.

---

[11] The State appears to concede that *Bagley* was clearly established. We reject this concession because parties cannot waive § 2254(d)'s standard of review. *Amado v. Gonzalez*, 758 F.3d 1119, 1133 n.9 (9th Cir. 2014) ("[The court has] the obligation to apply the correct [AEDPA] standard, for the issue is non-waivable.").

[12] We note that the district court did not have the benefit of *Greene v. Fisher*, 565 U.S. 34 (2011), when it identified the applicable clearly established law.

Hooper's claims fall within situation (2), "specific request" cases.

*Agurs* established different materiality standards for situations (1) and (3). *Agurs* did not set forth a materiality standard for situation (2), but the Court did explain that "material" means that "the suppressed evidence might have affected the outcome of the trial." *Id.* at 104.[13] Thus, even though the Supreme Court had not announced a precise materiality standard for "specific request" cases at the time of the Arizona Supreme Court's decision, *Brady* and *Agurs* had established governing legal principles that apply in such cases—a defendant must show that the evidence was suppressed, favorable, and material, meaning the evidence might have affected the outcome of the trial. *See Brady*, 373 U.S. at 87; *Agurs*, 427 U.S. at 104. These legal principles are the applicable clearly established law for AEDPA purposes here. *See Lockyer*, 538 U.S. at 71–72 ("'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.").[14]

---

[13] The Supreme Court later clarified in *Bagley* that *Agurs* did not establish a materiality standard for "specific request" cases. *Bagley*, 473 U.S. at 681. Rather, the Court explained that its statement in *Agurs* that "*Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial," was merely an explanation of the "meaning of the term 'materiality.'" *Id.* at 681 n.12 (citation omitted).

[14] Hooper identifies no Supreme Court precedent in existence at the time of the Arizona Supreme Court's decision that established a more favorable materiality standard for "specific request" cases than the materiality principle in *Agurs*, nor are we aware of any. Thus, even if we are somehow incorrect in our determination that there *was* clearly

### 1. AEDPA Analysis Regarding Merrill Benefits

The Arizona Supreme Court's decision on the *Brady* claim regarding the Merrill benefits was not an unreasonable application of clearly established law under § 2254(d)(1). The court identified the correct governing legal principles in *Brady* and *Agurs*. *See Bracy*, 703 P.2d at 472. The Arizona Supreme Court reviewed the trial evidence and determined that Merrill's testimony was "not pivotal."[15] *Id.* at 473. Rather, it determined that Marilyn's testimony was crucial. *Id.* The Arizona Supreme Court noted that her testimony was "particularly strong," and it found that evidence other than Merrill's testimony "showed defendant's presence in Phoenix in early and late December, his connection to Robert Cruz, and his participation in Cruz's conspiracy to kill Pat Redmond." *Id.* The court also determined that the Merrill benefits would not have affected the jury's view of Merrill's credibility because the "defense possessed and used a wealth of impeaching evidence against" him. *Id.* The court ultimately concluded that Hooper failed to meet *Agurs*'s materiality standard, stating that "we do not believe that three additional pieces of impeaching information

established federal law on this issue in June 1985, our error could inure only to Hooper's benefit; as without such clearly established federal law, the Arizona Supreme Court could not have unreasonably applied it, and Hooper would automatically lose on this issue under AEDPA. *See Brewer*, 378 F.3d at 954 (affirming the denial of a habeas petition under AEDPA for lack of clearly established Supreme Court precedent).

[15] During his closing, the prosecutor mentioned Merrill's testimony in reviewing all of the evidence, but he did not highlight it. This supports that Merrill's testimony was not crucial. *See Barker v. Fleming*, 423 F.3d 1085, 1100 (9th Cir. 2005) ("A useful measurement of the importance of [a witness] and the materiality of the withheld impeachment evidence is the lack of emphasis the prosecutor placed on his testimony.").

regarding Arnold Merrill might have affected the jury's belief in Mrs. Redmond and the other evidence." *Id.*

The Arizona Supreme Court properly found that Marilyn's testimony was key. Marilyn was an eyewitness to the crimes and was certain in her trial identifications of Hooper and Bracy. She had also identified both in pretrial lineups. As the court noted: "This evidence was particularly strong because Mrs. Redmond had ample opportunity to view all three men in her home." *Id.* The court also properly found that Merrill's testimony was "merely corroborative and not pivotal." *Id.* As the court found, the State's case was supported by evidence well beyond Merrill's testimony. In addition to Marilyn's testimony, the testimonies of Louie, Campagnoni, Bauer, and Tompkins, along with the State's other evidence discussed above, all supported Hooper's guilt.

We find reasonable the Arizona Supreme Court's determination that the Merrill benefits would not have affected the jury's view of Merrill's credibility. Merrill was vigorously impeached. The jury knew that Merrill was a known liar, self-interested criminal, and drug dealer and user. The jury also knew that he had lied to the police and had strong motives to lie, including to avoid a potential death sentence.

Given the overwhelming evidence of Hooper's guilt presented at trial, and the improbability that the Merrill benefits would have affected the jury's view of Merrill, the Arizona Supreme Court reasonably concluded that Hooper failed to show that the Merrill benefits "might have affected the outcome of the trial." *Agurs*, 427 U.S. at 104. Thus, the Arizona Supreme Court did not unreasonably apply clearly established law, and we are barred from reviewing Hooper's claim based on the Merrill benefits under § 2254(d)(1).

Alternatively, Hooper argues that we can review his claim on the Merrill benefits under § 2254(d)(2) because the Arizona Supreme Court's finding that the Merrill benefits were cumulative impeachment evidence was an unreasonable factual determination.[16]   A finding that evidence is cumulative is a factual determination subject to § 2254(d)(2).  *See Vega*, 757 F.3d at 974 ("We further conclude that the state court's findings that Father Dan's testimony would have been cumulative and would have had no effect on the verdict is an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.").

The Arizona Supreme Court's determination that the Merrill benefits were cumulative impeachment evidence was not unreasonable.  As discussed above, the defense severely impeached Merrill.  The evidence portrayed him as a serial liar with strong incentives to fabricate his testimony against Hooper and Bracy to avoid a potential death sentence for his own involvement in the Redmond crimes and to continue to receive favorable treatment from the State.  The undisclosed Merrill benefits would have shown that Merrill received monetary benefits from the State and Ryan, making it more likely that he was biased and motivated to lie.  But considering the impeachment evidence that was presented, it was already firmly established that Merrill was biased and motivated to lie.  Thus, the Arizona Supreme Court's determination was reasonable.

---

[16] Although Hooper failed to raise this argument in the district court, we address it because the State responds to the argument and does not assert waiver.  *See United States v. Doe*, 53 F.3d 1081, 1082–83 (9th Cir. 1995) (reviewing the merits of a claim when the government failed to assert waiver).

Our conclusion is supported by Ninth Circuit cases in which we determined that undisclosed impeachment evidence was cumulative under similar circumstances. For example, in *Gentry v. Sinclair*, 705 F.3d 884 (9th Cir. 2013), the prosecution suppressed evidence that the state had intervened with the parole board to secure a witness's parole. *Id.* at 902–03. We held that this impeachment evidence against the witness was cumulative because the witness had been substantially impeached at trial through evidence of his "many past crimes, including his conviction for perjury," and "his extensive history of using false names." *Id.* at 903; *see also id.* at 904; *see also Barker v. Fleming*, 423 F.3d 1085, 1096–97 (9th Cir. 2005) (holding that suppressed convictions were cumulative impeachment evidence in light of other evidence showing that the witness had a "penchant for lying," had been in and out of jail several times, and had made a deal with the state on three other crimes).

In sum, AEDPA bars our review of Hooper's *Brady* claim as to the undisclosed Merrill benefits. But as discussed below, even if we were to review Hooper's *Brady* claim on the Merrill benefits de novo, it would fail because there is no reasonable probability that the trial outcome would have been different had the evidence been disclosed.

## 2. AEDPA Analysis Regarding Police Reports

Hooper argues that we may review the Arizona Supreme Court's decision on the delayed disclosure of the police reports related to the Bradfords and Ward because the Arizona Supreme Court unreasonably applied clearly established law under § 2254(d)(1). Hooper cites *Brady* and *Giglio v. United States*, 405 U.S. 150 (1972), as the applicable clearly established law. But those cases did not clearly establish that a delayed disclosure is a *Brady*

violation where the defense had the opportunity to use the evidence at trial. Nor has any Supreme Court case so held.

Because there was no clearly established law governing *Brady* claims based on such delayed disclosures, the Arizona Supreme Court's decision "cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer*, 378 F.3d at 955. AEDPA therefore prevents us from reviewing the Arizona Supreme Court's decision on the police reports.

### 3. AEDPA Analysis Regarding Photos

Like the police reports, the prosecution disclosed the photos to Hooper during trial, and he used them at trial. Thus, Hooper's argument that the Arizona Supreme Court's decision on the photos was an unreasonable application of clearly established law fails for the same reason his argument on the police reports fails—there was no clearly established law holding that a delayed disclosure is a *Brady* violation where the defense had the opportunity to use the evidence at trial.

Hooper also asserts, however, that we may review the Arizona Supreme Court's decision on the photos because its decision was based on the unreasonable factual determination that no photos had been admitted at trial.[17] In analyzing the suppression of the photos, the Arizona Supreme Court focused on the specific incident during trial when defense counsel objected to Detective Quaife's testimony about the photos on redirect. *See Bracy*, 703 P.2d

---

[17] Hooper did not raise this argument in the district court. Even so, we consider it because the State fails to assert waiver. *See Doe*, 53 F.3d at 1082–83.

at 472. This incident occurred before the photos had been admitted.

Because we are unable to determine from the record the specific argument that was made to the Arizona Supreme Court with respect to the photos, it is unclear whether the court's reasoning was based on an unreasonable factual determination. We therefore assume, without deciding, that the Arizona Supreme Court's decision on the photos was based on an unreasonable factual determination. This assumption does not change the outcome on the *Brady* claims because, as discussed below, Hooper's claims fail even on de novo review.

### 4. De Novo Review of *Brady* Claims

Hooper argues that we may review all of his *Brady* claims de novo, and that he is entitled to relief under de novo review. We disagree because we have concluded above that AEDPA bars our review of the police reports and the Merrill benefits. But as we next discuss, even assuming we could review all of his *Brady* claims de novo, they would fail.

Hooper satisfies two of the three *Brady* elements—the evidence was favorable and (at least partially) suppressed. *See* 373 U.S. at 87. Thus, his *Brady* claims turn on the prejudicial effect or materiality of the photos, police reports, and Merrill benefits.[18]

"[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

---

[18] "[F]or *Brady* purposes, ['prejudicial' and 'material'] have come to have the same meaning." *Benn v. Lambert*, 283 F.3d 1040, 1053 n.9 (9th Cir. 2002).

different.    A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.  We "must examine the trial record, evaluate the withheld evidence in the context of the entire record, and determine in light of that examination whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (quotation marks, alterations, and citations omitted).    A *Brady* violation occurs when the undisclosed favorable evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

"[M]ateriality of the withheld evidence [must] be analyzed cumulatively . . . ." *Barker*, 423 F.3d at 1094.  We first examine the "force and nature of the withheld evidence item by item," and then "we consider the cumulative effect of the suppressed evidence." *Id.* at 1099.  "Gauging the collective impact of the withheld evidence requires us to step back and consider the strength of the prosecution's case . . . ." *Id.*

The prosecution provided Hooper with the photos and police reports during its case-in-chief, about three weeks before Hooper presented his defense.  Hooper used the evidence to show that the Bradfords and Ward should have been treated as suspects in the Redmond crimes and that the officers unreasonably discounted them as suspects.  Hooper claims that earlier disclosure of the photos would have allowed him to (1) show the jury the similarities between the brown jacket worn by Michael Bradford to the one worn by the intruder as described by Marilyn and (2) emphasize the similarities between Hooper and the Bradfords and Ward to show that Marilyn had mistakenly identified Hooper.  But

Hooper had the opportunity to use the photos for these purposes. Hooper also asserts that earlier disclosure of the photos and reports would have changed his defense theory and opening statement, but he offers no specifics on how his theory or opening statement would have changed.[19]

Thus, Hooper either used the photos and reports or had a meaningful opportunity to do so. And he fails to show how earlier disclosure would have made this evidence more useful to his defense. We discern no prejudice from the delayed disclosure of the photos and reports. *See United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) (holding no *Brady* violation because "defendants had substantial opportunity to use the documents and to cure any prejudice caused by the delayed disclosure").

Turning to the Merrill benefits, Hooper could have used this evidence to impeach Merrill. But the defense presented overwhelming evidence discrediting Merrill and showing he had personal motives to lie. The jury knew that Merrill was a serial liar, a criminal, and had received significant benefits from the State for his cooperation, including a deal that ensured he would not be sentenced to death for the Redmond murders and an out-of-jail visit so he could have sex with his wife. Given the wealth of impeachment evidence that was presented, the nondisclosure does not undermine confidence in the verdict. At best, it is exceedingly unlikely that additional evidence showing that Merrill and his wife received money and other benefits from Ryan and the State

---

[19] And, of course, as noted above, Marilyn testified that the men in the photos were *not* the men who invaded her home, murdered her husband and mother, and tried to murder her.

equaling several thousand dollars would have changed the jury's view of Merrill's credibility.

To the extent the Merrill benefits might have suggested that the State's investigation was tainted because Ryan engaged in improper conduct, this theory was presented to the jury and supported by other, more compelling evidence. The jury knew that Ryan had taken Merrill out of jail to have sex with his wife, had stopped his tape-recorded interview with Merrill more than twenty times for no apparent reason other than to coach Merrill on what he should say, threatened a witness with physical violence, directed a witness to lie to the police and gave that witness money, and lied to a probation officer to secure a reduced sentence for Campagnoni. Thus, the jury had many reasons to question the integrity of the State's investigation based on Ryan's actions, and the Merrill benefits would have simply added another reason to the already compelling evidence.

Having examined the withheld evidence individually, we now consider its cumulative effect, which "requires us to step back and consider the strength of the prosecution's case." *Barker*, 423 F.3d at 1099.

Marilyn was the State's key witness. Her in-court identifications of Hooper and Bracy as the intruders were certain and unwavering. She had years of work experience in recognizing people by their physical features, and during the encounter she had several opportunities to look at the intruders' faces. Her testimony was corroborated by substantial evidence, other than Merrill's testimony, which showed that Hooper and Bracy were in Phoenix on New Year's Eve and involved in the Redmond crimes. This evidence that Hooper and Bracy were both in Phoenix on

New Year's Eve, and thus, that they had created fake alibis,[20] provided additional evidence of Hooper's guilt. *See United States v. Dorsey*, 677 F.3d 944, 950 (9th Cir. 2012) ("That Dorsey tried to create a fake alibi was not merely ineffective, but also stands high in the hierarchy of evidence tending to show guilt.").

It is at best unlikely that earlier disclosure of the photos and reports, and disclosure of the Merrill benefits, would have affected the jury's view of the overwhelming evidence supporting Hooper's guilt. The photos and reports were presented to the jury, and Hooper used them to challenge the officers' reasons for discounting the Bradfords and Ward as suspects in the Redmond crimes and to argue that the men should have been treated as suspects. Hooper fails to show how the delayed disclosures had any effect on the evidence supporting his guilt.

The Merrill benefits would have given the jury additional reasons to disbelieve Merrill and to question the State's investigation. But Merrill was not a crucial witness. Hooper's guilt was supported by significant other evidence, and further impeaching Merrill would not have affected Marilyn's key testimony or the testimonies of other important witnesses. The defense presented extensive evidence portraying Ryan as an unscrupulous investigator. Hooper used the evidence to suggest that the State's investigation was tainted, including that Ryan had improperly influenced Marilyn's pretrial identifications of Hooper and Bracy. The jury rejected that theory. It is at best unlikely that additional evidence that Ryan and the State gave benefits *to Merrill and his wife* would have affected the

---

[20] The jury obviously did not believe the alibis.

jury's view of Marilyn's crucial testimony or the testimonies of witnesses other than Merrill.

In sum, earlier disclosure of the photos and reports and disclosure of the Merrill benefits would not have "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. The State had a strong case, even without Merrill's testimony. The jury knew about the photos and reports, Hooper used them in his defense, and the jury rejected his arguments. The jury knew that Merrill was a self-interested liar, and that Ryan was an unscrupulous investigator. Thus, "[t]he difference between the story . . . that the jury knew and that which would have been presented with the withheld evidence is not significant." *Barker*, 423 F.3d at 1101. We are therefore confident in the verdict and conclude that, even assuming AEDPA does not bar our review of Hooper's *Brady* claims, the delay in producing the photos and police reports, and the failure to disclose the Merrill benefits, were not material.

## B. Motion for Leave to Amend—Eighth and Fourteenth Amendment Claims

Hooper requested leave to amend his petition to include a claim that his death sentence violates the Eighth and Fourteenth Amendments because the sentence was based on his invalid Illinois convictions. The district court denied his request as futile. The district court reviewed the state post-conviction court's 2005 decision and found that its rejection of Hooper's claim was neither contrary to nor an unreasonable application of clearly established law under AEDPA. The post-conviction court rejected the claim because, even assuming the Illinois convictions were invalid, Hooper failed to show he would have probably received a sentence less than death because there were still two valid aggravating factors and no mitigating factors. The

district court determined that the post-conviction court had properly reweighed the aggravating and mitigating factors or conducted a harmless error analysis in accordance with Supreme Court precedent. The district court concluded that any amendment would be futile because Hooper failed to overcome AEDPA deference as to his claim.

"The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); *see Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) (applying Rule 15(a) in a habeas case). "Futility of amendment can, by itself, justify the denial of a motion for leave to amend." *Bonin*, 59 F.3d at 845. Amendment is futile if the claim sought to be added is not viable on the merits. *See Murray*, 745 F.3d at 1015.

We agree with the district court that amendment would be futile. We first consider Hooper's claim that his Eighth Amendment rights were violated because his death sentence was based on his invalid Illinois convictions. We then discuss Hooper's Fourteenth Amendment due process claim.[21]

### 1.  Eighth Amendment Claim

Under AEDPA, we review the post-conviction court's decision rejecting Hooper's Eighth Amendment claim. *See id.* at 1006 (looking through the Arizona Supreme Court's

---

[21] Although the district court failed to specifically address Hooper's Fourteenth Amendment claim, we exercise our discretion and consider the claim because it is a purely legal question that can be decided on the record developed below. *See Quinn v. Robinson*, 783 F.2d 776, 814 (9th Cir. 1986) ("We have discretion to decide whether to address an issue that the district court did not reach if the question is a purely legal one and the record has been fully developed prior to appeal . . . .").

decision to the last reasoned state-court decision).  In doing so, we apply the clearly established law that, when a death sentence is based in part on an invalid aggravating circumstance, an appellate court can uphold the sentence if it either reweighs the aggravating and mitigating circumstances or reviews the sentence for harmless error. *Clemons v. Mississippi*, 494 U.S. 738, 741, 751–54 (1990).

Under Arizona's death penalty statute, the court "shall impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated in [the statute] and that there are no mitigating circumstances sufficiently substantial to call for leniency."  A.R.S. § 13-703(E). "[U]nder A.R.S. § 13-703(E), the trial court *must* impose a sentence of death if it finds the existence of one statutory aggravating factor and does not find the existence of any mitigating factor . . . .  A death sentence is thus required regardless of the trial court's belief that a life sentence is appropriate."  *State v. Beaty*, 762 P.2d 519, 533–34 (Ariz. 1988); *see also State v. Jordan*, 672 P.2d 169, 173 (Ariz. 1983) (en banc) ("Where one or more statutory aggravating circumstance is found, and no mitigation exists, the statute requires the death penalty." (quoting *State v. Gretzler*, 659 P.2d 1, 13 (Ariz. 1983) (en banc))).  This provision of Arizona's death penalty statute has been upheld as constitutional by the Supreme Court. *See Walton v. Arizona*, 497 U.S. 639, 651–52 (1990) (plurality opinion) (evaluating Arizona's death penalty statute and reaffirming that if a sentencer was not precluded from considering all relevant mitigation, a "statute requiring the imposition of the death penalty if aggravating circumstances were found to exist but no mitigating circumstances were present" is constitutional), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

Hooper argues that the state court's decision was contrary to Supreme Court precedent because it automatically affirmed his death sentence. We disagree. The state court first determined that, even if Hooper's Illinois convictions were invalid, two aggravating circumstances remained—he committed the offense in expectation of receiving something of pecuniary value under A.R.S. § 13-703(F)(5) and in an especially heinous, cruel, or depraved manner under A.R.S. § 13-703(F)(6). The court then found that there were no mitigating circumstances. Because there were two aggravators and no mitigators, the court determined that the sentencer would have been required to impose a death sentence under Arizona law, and thus Hooper failed to show that the invalidity of his Illinois convictions would have changed his sentence.

The state court conducted a harmless error analysis in accordance with Supreme Court precedent. *See Clemons*, 494 U.S. at 741, 751–54. It properly determined that any error in including Hooper's invalid convictions was harmless because Arizona law requires a death sentence if there is at least one aggravating circumstance and no mitigating circumstances. *See Jordan*, 672 P.2d at 173. Thus, Hooper fails to show that the state court's decision was contrary to clearly established law.[22]

---

[22] Hooper makes no claim that the state post-conviction court failed to apply the "beyond a reasonable doubt" harmless error standard. *See Clemons*, 494 U.S. at 753. Even if he had, he would have had to overcome our rule that, "in AEDPA cases, we apply a presumption that state courts know and follow the law and accordingly give state-court decisions the benefit of the doubt." *Poyson v. Ryan*, 879 F.3d 875, 889 (9th Cir. 2018) (quotation marks and citations omitted). More importantly, as discussed below, even if Hooper could overcome AEDPA, his claim would fail because he cannot show actual prejudice.

Hooper also argues that the post-conviction court's decision was based on an unreasonable factual determination that there were no mitigating circumstances. We reject this argument because the court's factual determination was reasonable. During the aggravation and mitigation hearing, Hooper presented no evidence. During sentencing, the court noted that "Hooper neither presented any evidence, nor had a statement to make concerning mitigating factors or any other fac[e]t of his presentation in court." The Arizona Supreme Court agreed that Hooper presented no mitigating circumstances. *Hooper*, 703 P.2d at 495 ("The trial court also considered all possible mitigating circumstances and found none to exist. We agree."). And Hooper identifies no mitigating circumstances that the sentencing court or the Arizona Supreme Court found. The state post-conviction court's factual determination was not unreasonable (and indeed was compelled).

Moreover, even if Hooper could show that the state court's decision was contrary to clearly established law because it automatically affirmed his sentence, his claim would be unavailing because he fails to show actual prejudice.

"[Federal] habeas petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Davis v. Ayala*, 576 U.S. 257, 267 (2015) (quotation marks omitted) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). "Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 267–68 (quotation marks omitted) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)); *see also Beardslee v. Brown*, 393 F.3d 1032, 1041–44 (9th Cir. 2004)

(applying *Brecht*'s harmless error test to an Eighth Amendment error based on the improper consideration of invalid aggravating factors).

Two valid aggravating circumstances remain after excluding the two that were based on the invalid Illinois convictions.**[23]** Hooper makes no claim that the invalid convictions in any way tainted the two remaining aggravators, nor could he. Under Arizona law, as long as Hooper had at least one valid aggravator, he was eligible for the death penalty. *See* A.R.S. § 13-703(E). Because the state court found no mitigators, and we must defer to that finding under AEDPA, Arizona law requires the imposition of a death sentence. *See Beaty*, 762 P.2d at 533–34. Thus, Hooper's claim would fail because he suffered no prejudice from the introduction of the invalid convictions.

Because Hooper's Eighth Amendment claim is not viable, the district court properly denied him leave to amend his petition based on futility.

## 2. Fourteenth Amendment Claim

Hooper primarily argues that, under *Brown v. Sanders*, 546 U.S. 212 (2006), the introduction of the invalid Illinois convictions during sentencing violated his due process rights under the Fourteenth Amendment, mandating the reversal of his death sentence. Thus, according to Hooper, the Arizona Supreme Court's summary dismissal of his due process claim was contrary to or an unreasonable application of

---

**[23]** Under A.R.S. § 13-703(F)(5), that Hooper "committed the offense[s] as consideration for the receipt or in expectation of the receipt of anything of pecuniary value," *Hooper*, 703 P.2d at 494, and under A.R.S. § 13-703(F)(6), that Hooper "committed the offense[s] in an especially heinous, cruel, or depraved manner," *id.* at 495.

*Sanders*.  Hooper's claim is not viable, but we first address the parties' dispute over whether *Sanders* was clearly established for AEDPA purposes.

*Sanders* was decided after the post-conviction court's 2005 decision but before the Arizona Supreme Court's summary dismissal.  Therefore, whether *Sanders* was clearly established depends on whether the Arizona Supreme Court's summary denial was the last state-court adjudication on the merits.  *See Greene*, 565 U.S. at 38–40 (holding that clearly established law under AEDPA includes only Supreme Court decisions announced after the last state-court adjudication on the merits).

We need not decide whether *Sanders* was clearly established because, even if it were, Hooper's due process claim is not viable.[24]

Hooper argues that *Sanders* established a categorical rule that irrelevant evidence introduced at sentencing is a due

---

[24] We will assume for our discussion that Hooper exhausted his due process claim and that it was adjudicated on the merits by the state court. We note, however, that Hooper likely procedurally defaulted his due process claim because he did not raise it in his petition for review to the Arizona Supreme Court.  *See* Ariz. R. Crim. P. 32.2(a)(3) (precluding relief on the ground that a sentence was imposed in violation of the Constitution when that ground has been "waived at trial or on appeal, or in any previous post-conviction proceeding"); *Murray*, 745 F.3d at 1016 ("[T]he Supreme Court has recognized Arizona Rule of Criminal Procedure 32.2(a)(3) as an independent and adequate state ground that bars federal habeas review of constitutional claims.").  Hooper supplemented his petition and provided a citation to *Sanders*, but he did not allege a due process violation under *Sanders*.  This was likely insufficient to exhaust his due process claim.  *See Powell v. Lambert*, 357 F.3d 871, 874 (9th Cir. 2004) ("A petitioner has exhausted his federal claims when he has fully and fairly presented them to the state courts.").  But the State has not asserted procedural default.

process violation that mandates reversal of a sentence, and therefore, the state court's failure to reverse his sentence was contrary to or an unreasonable application of *Sanders*. We disagree because *Sanders* did not establish any such rule.

Hooper's argument is based on the following statement in *Sanders*: "If the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal without regard to the rule we apply here." 546 U.S. at 220–21. First, this statement is not the holding of *Sanders* but was made in response to the dissent's criticism of *Sanders*'s holding. *Id.*

Second, the Supreme Court held in *Romano v. Oklahoma*, 512 U.S. 1 (1994), that, in capital sentencing proceedings, the introduction of irrelevant and prejudicial evidence violates the Due Process Clause of the Fourteenth Amendment when admission of the evidence "so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." *Id.* at 12. Nothing in *Sanders* suggests that the Court intended to overrule *Romano*'s test with a categorical rule that irrelevant evidence introduced at sentencing is a due process violation that mandates reversal of a sentence.

Finally, the Court confirmed in *Kansas v. Carr*, 577 U.S. 108 (2016), that *Romano*'s test continues to apply to alleged due process violations based on improperly admitted evidence at capital-sentencing proceedings: "The test prescribed by *Romano* for a constitutional violation attributable to evidence improperly admitted at a capital-sentencing proceeding is whether the evidence 'so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process.'" *Id.* at 123–24 (quoting *Romano*, 512 U.S. at 12).

In addition, *Carr* appears to reject the categorical rule urged by Hooper: "The mere admission of evidence that might not otherwise have been admitted . . . does not demand the automatic vacatur of a death sentence." *Id.* at 124.

Thus, even if *Sanders* was clearly established, it was not the *applicable* clearly established law governing Hooper's due process claim. A state court's failure to apply inapplicable Supreme Court precedent cannot be contrary to or an unreasonable application of clearly established law, and therefore Hooper fails to overcome AEDPA deference as to his due process claim. And Hooper presents no argument that the state court's decision was contrary to or an unreasonable application of *Romano*. For these reasons, it would be futile to allow Hooper to amend his petition to include his due process claim.[25]

## C. Ineffective Assistance of Sentencing Counsel Claim

Hooper's federal habeas petition claims that his sentencing counsel, Woods, rendered ineffective assistance by failing to investigate and present any mitigation evidence. Hooper did not raise this claim in his first state post-conviction petition, but he raised it in his second petition. In denying his second petition, the post-conviction court found

---

[25] We also reject Hooper's reliance on Eighth Amendment law to support his due process claim based on the erroneous admission of evidence. *See Carr*, 577 U.S. at 123 ("Whatever the merits of defendants' procedural objections, we will not shoehorn them into the Eighth Amendment's prohibition of 'cruel and unusual punishments.' . . . [I]t is not the role of the Eighth Amendment to establish a special 'federal code of evidence' governing 'the admissibility of evidence at capital sentencing proceedings.' Rather, it is the Due Process Clause that wards off the introduction of 'unduly prejudicial' evidence that would 'render the trial fundamentally unfair.'" (citations and brackets omitted)).

that the claim was procedurally barred. The district court also found that the claim was procedurally defaulted, and that Hooper failed to show cause to excuse the procedural default.

Hooper argues that the procedural default is excused under *Martinez* because his post-conviction counsel, Seplow, provided ineffective assistance by failing to raise the claim in his first state post-conviction petition. He also argues that the district court abused its discretion in denying his requests for discovery and an evidentiary hearing.

### 1. *Martinez* Analysis

"A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Martinez*, 566 U.S. at 10.[26] Under *Martinez*, "when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," *id.* at 14, "a prisoner may establish 'cause' to excuse the procedural default of a claim that the prisoner had received ineffective assistance of counsel . . . during sentencing proceedings by demonstrating that counsel in the initial-review collateral proceeding was ineffective or there was no counsel in such a proceeding," *Clabourne v. Ryan*, 745 F.3d 362, 375 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 819 (9th Cir. 2015) (en banc).[27] A prisoner establishes prejudice by

---

[26] Procedural default may also be excused when a prisoner "demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). This exception is not at issue here.

[27] Because the parties do not dispute that *Martinez* applies to Hooper's ineffective assistance of counsel claim, we assume without

demonstrating "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14.

The only issue before us is whether Hooper has established "cause" to excuse the procedural default.[28]

To establish "cause," Hooper must show that his post-conviction counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). That is, Hooper must show that post-conviction counsel's performance was deficient and that he was prejudiced by this deficient performance, meaning that "there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Clabourne*, 745 F.3d at 377. "[F]or us to find a reasonable probability that [post-conviction] counsel prejudiced a petitioner by failing to raise a trial-level [ineffective assistance of counsel (IAC)] claim, we must also find a reasonable probability that the trial-level IAC claim would have succeeded had it been raised." *Runningeagle*, 825 F.3d at 982. Stated differently, "[i]f the ineffective assistance of trial counsel claim lacks merit, then the state

---

deciding that Arizona law at the time of Hooper's appeal required him to raise the claim in an initial-review collateral proceeding. *But see Runningeagle*, 825 F.3d at 981 n.12 (expressing no opinion on whether "Arizona law effectively required petitioners to bring [ineffective assistance of counsel] claims in initial-review collateral proceedings" before 1989).

[28] The district found that the motions panel's remand order determined that Hooper had established prejudice. The State does not challenge this finding. We therefore assume, without deciding, that Hooper has satisfied the prejudice prong of the "cause and prejudice" test.

habeas counsel would not have been deficient for failing to raise it." *Atwood v. Ryan*, 870 F.3d 1033, 1060 (9th Cir. 2017).[29]

Thus, we first consider whether Woods was ineffective under *Strickland*. Even assuming Woods performed deficiently by failing to investigate and present mitigation evidence (a question we need not and do not reach),[30] we

---

[29] Hooper argues that to establish "cause," he need show only that post-conviction counsel rendered deficient performance, citing *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) (en banc). *See id.* at 1245–46 (plurality opinion) (stating that to establish "cause," "a prisoner need show only that his PCR [post-conviction relief] counsel performed in a deficient manner" and "need not show actual prejudice resulting from his PCR counsel's deficient performance, over and above his required showing that the trial-counsel IAC claim be 'substantial' under the first *Martinez* requirement"). We reject this argument because we have consistently distinguished *Detrich* and reaffirmed the *Clabourne* framework, which requires a petitioner who was represented by counsel in the initial-review collateral proceeding to establish "cause" by showing *Strickland* prejudice. *See Rodney v. Filson*, 916 F.3d 1254, 1260 & n.2 (9th Cir. 2019) (confirming that a petitioner represented by post-conviction counsel must show *Strickland* prejudice and the *Detrich* standard in the plurality opinion "applies [only] in cases in which the petitioner was *not* represented by counsel in the initial-review collateral proceeding"); *see also Djerf v. Ryan*, 931 F.3d 870, 880 (9th Cir. 2019) (applying *Clabourne* and requiring the petitioner to show *Strickland* prejudice to establish "cause").

[30] We do note some of the explanations Woods provided for his performance in 1983, when questioned during a 1992 deposition taken in connection with Bracy's post-conviction proceeding:

> It was clear to me there were no mitigating factors, and almost every aggravating factor listed in the statute was present.

find there is no "reasonable probability that, but for [Woods's alleged] unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). "The likelihood of a different result must be substantial, not just conceivable." *Apelt v. Ryan*, 878 F.3d 800, 832 (9th Cir. 2017) (quoting *Richter*, 562 U.S. at 112).

The mitigation evidence that Hooper now presents, which he has had decades to collect, falls into two general categories—evidence of his life history and evidence related to his mental health. Hooper grew up in Chicago in a segregated, impoverished neighborhood. He lived with his mother, father, and four siblings. Both of his parents were

> \*\*\*
>
> [M]y goal was to try to have him not get the death sentence. And I believe my best chance would be to try to construct an argument directed specifically at that judge that maybe he might buy rather than put on a completely ineffectual and unpersuasive mitigation hearing just for the record, because it wouldn't have done any good. So that's what I did.
>
> \*\*\*
>
> I had a choice there. I could just try to protect the record, or I could try to talk the judge out of the death penalty. And I didn't think I could do both. I could aggravate the situation with the judge by coming up with —There were no mitigating factors. That's the bottom line. There were none. I could try to make up something or come up with some phony deal that he would not buy, or I could lay it on the line on a different level and see if I could persuade him.

employed. His mother worked in manufacturing for twenty years and then worked at the post office for twenty-two years. His father worked in the stockyards. Hooper's "family never had serious money problems." His parents provided the children with food and clothing, and the family attended church every Sunday.

As a child, Hooper saw people being shot in the streets, witnessed a person being beaten to death with a baseball bat, and saw a man "stomped to death in the street." He also saw prostitutes and "stepped over drug addicts to get to school." Hooper's sister stated that their parents "tried to shield" them from the crime and drug use in their neighborhood.

Growing up, Hooper suffered physical injuries, was beaten up by gangs, and had to fight to survive. At age eleven, he was hit in the head by a ball while playing baseball and knocked unconscious. At age twelve or thirteen, he was knocked unconscious by blows from an ax handle during a fight, and had his arm almost severed off by the ax blade. Hooper was once beaten in the head with a baseball bat.

Hooper presents evidence that he was physically abused by his father. His father whipped him and his siblings "over their clothes and not on their bare skin" when they misbehaved. His father whipped him with extension cords at least two times a week. Hooper's father drew a gun on Hooper and his siblings at least two times, but Hooper's sister stated, "He was not going to shoot us." There was no physical abuse between Hooper's parents, but they argued a lot.

Hooper was never in a gang, but he hung out with older, more violent juveniles. He first got into criminal trouble when he was thirteen or fourteen years old for robbery and vandalism. When his parents learned about his problems,

they "repeatedly sat him down and talked to him." Hooper was sent to various reformatories and juvenile detention centers. He offers news articles supporting that incidents of sexual assault and physical abuse occurred at two of the institutions in which he had been confined. But Hooper does not state if he was physically or sexually abused at those institutions.

Hooper's parents did not use drugs or abuse alcohol. Hooper started drinking alcohol when he was seventeen, and he reported that he consumed heavy amounts of alcohol "for years" and stopped only when he was incarcerated in 1981.

Hooper has been institutionalized for most of his adult life. While incarcerated as a young adult, he obtained his GED and completed one year of college. In his twenties, he spoke to youth about staying away from a life of crime. Hooper has been a model prisoner and has not committed any disciplinary infractions since his extradition to Arizona in 2006. Hooper provides statements from several character witnesses who described him as supportive, caring, and a good person.

Turning to Hooper's evidence related to his mental health, he submits declarations from two mental health professionals. In 2015, psychologist Dr. James Garbarino declared that based on reports from Hooper's siblings, Hooper had been a sensitive child with a vulnerable temperament. His upbringing in an "urban war zone" resulted in his desensitization to violent acts. Hooper experienced chronic trauma from the physical abuse he suffered within his family and community and his exposure to the traumatic environments in juvenile detention facilities. He appeared to be emotionally disconnected from adverse experiences and had difficulty regulating his emotions. Dr. Garbarino noted that a family member stated that from an

early age Hooper had a "Jekyll/Hyde pattern," as he had an "'explosive temper,' and could shift from being 'sweet' to expressing 'rage.'" Dr. Garbarino concluded that Hooper's chronic trauma and "urban war zone" environment contributed to his chronic antisocial and violent behavior. Dr. Garbarino opined that Hooper was not beyond rehabilitation based on positive reports from family, friends, and prison staff.

Dr. Robert Heilbronner, a clinical neuropsychologist, reviewed records and evaluated Hooper in 2011. He found that Hooper demonstrated average IQ, average verbal intellectual abilities, and borderline to low average nonverbal performance abilities. Because he was unable to administer a complete battery of neuropsychological tests, Dr. Heilbronner was unable to explain the cause of the discrepancy between the verbal intellectual abilities and nonverbal performance abilities scores. Nevertheless, he surmised that multiple head traumas and social-educational deprivations as a child were likely contributors. He opined that the discrepancy "more likely than not reflects an abnormal pattern of intellectual functioning" and that "this pattern of impairment was present in 1981."

Later in 2015, Dr. Heilbronner completed his evaluation of Hooper by administering the rest of the neuropsychological tests. He was unable to determine with any degree of neuropsychological certainty the causes of the observed discrepancy. Dr. Heilbronner concluded that, had Hooper been tested closer to the time of trial, it is more likely

than not that the results would have shown objective data of brain impairment.**[31]**

As for the aggravation evidence, the State established two statutory aggravating circumstances:  Hooper (1) "committed the offense[s] as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value," A.R.S. § 13-703(F)(5), and (2) "committed the offense[s] in an especially heinous, cruel or depraved manner," A.R.S. § 13-703(F)(6).**[32]**

The murder-for-hire aggravating circumstance carries great weight. *See State v. Harrod*, 183 P.3d 519, 535 (Ariz. 2008) (en banc) ("[T]he pecuniary gain aggravating factor, particularly in the case of a contract killing, is especially strong.  Accordingly, when a 'hired hit' has taken place, the (F)(5) aggravator has substantial weight." (citation omitted)).

The Arizona Supreme Court found that these facts established the existence of the "especially heinous, cruel or depraved" aggravating circumstance:  the victims were herded at gunpoint, "forced to lie down on a bed, had their

---

**[31]** In light of Dr. Heilbronner's 2011 and 2015 evaluations, we deny as moot Hooper's 2010 motion requesting a confidential contact visit between Dr. Heilbronner and Hooper to conduct a neuropsychological examination.

**[32]** Hooper argued below and appears to argue on appeal that our prejudice analysis should exclude the two aggravating circumstances based on the invalid Illinois convictions.  We need not reach this issue because, even assuming that we should exclude the two invalid aggravating circumstances, Hooper fails to show that there is a "reasonable probability that, but for [Woods's alleged] unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

hands taped behind their backs, and were gagged with socks"; "[e]xcept for the first victim, each of them had to endure the 'unimaginable terror' of having their loved ones shot to death within their hearing and then having to wait for their own turn to come"; "Phelps did not die from the first gunshot wound to her head, . . . she did not lose consciousness as a result thereof, and . . . she most certainly suffered pain from that wound"; the murderers inflicted "gratuitous violence" or "needless mutilation" by slashing Redmond's throat after he had been shot twice through the head; and "the murderers killed Mrs. Phelps, an elderly houseguest of the Redmonds with no possible interest in their business affairs." *Bracy*, 703 P.2d at 481–82 (quoting in part *State v. McCall*, 677 P.2d 920, 934 (Ariz. 1983) (en banc)); *see also Hooper*, 703 P.2d at 495. The trial court also observed that one of the murderers said "'we don't need these two anymore[,'] which] shows the inhumane and debase[d] motive possessed by [them]." Given these details of the Redmond murders, the "especially heinous, cruel or depraved" aggravating circumstance is also of substantial weight.

In contrast, Hooper's mitigation evidence is weak. The evidence of his difficult upbringing is "by no means clearly mitigating." *Cullen v. Pinholster*, 563 U.S. 170, 201 (2011). That Hooper engaged in violent crimes such as robbery when he was thirteen, continued to engage in criminal conduct despite having been sent to juvenile detention and his parents' attempts to intervene, and then continued a life of crime throughout his adult life, could have caused a jury to believe that he was beyond rehabilitation. *See id.* ("The new evidence relating to Pinholster's family—their more serious substance abuse, mental illness, and criminal problems—is also by no means clearly mitigating, as the jury might have concluded that Pinholster was simply beyond

rehabilitation." (citation omitted)). Additionally, that Hooper was *thirty-five years old* when he committed the Redmond murders further decreases the mitigating effect of his childhood circumstances. *See State v. Ellison*, 140 P.3d 899, 927 (Ariz. 2006) (en banc) ("[Defendant's] childhood troubles deserve little value as a mitigator for the murders he committed at age thirty-three.").

Dr. Garbarino's assessment is also not clearly mitigating. Though he surmised that Hooper was not beyond rehabilitation, he concluded that Hooper's upbringing "desensitized him to acting in a violent manner" and caused him to develop a "war zone mentality." This evidence could have weighed against Hooper because it shows his propensity for violence. *See Apelt*, 878 F.3d at 834 ("[P]resenting Apelt's upbringing and activities in Germany to explain how Apelt became a calculating killer arguably could weigh in favor rather than against the death penalty.").

The evidence of his alcohol use carries little or no weight because there is no evidence that Hooper was influenced by alcohol at the time of the Redmond murders. *See Henry v. Ryan*, 720 F.3d 1073, 1090 (9th Cir. 2013) ("[S]tate courts are free to consider the absence of a causal connection when assessing the quality and strength of such evidence."); *cf.* A.R.S. § 13-703(G)(1) (recognizing as a statutory mitigating circumstance: "The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired"). Further, Hooper's heavy alcohol use might have weighed against him. *See Henry*, 720 F.3d at 1090 n.11 (noting that a history of alcoholism might be considered aggravating).

Hooper's evidence of good character and prison behavior is of minimal weight, especially given the strong rebuttal evidence that the prosecutor could have highlighted

and introduced. *See Harrod*, 183 P.3d at 534–35 (commenting that mitigating evidence of good character deserves less weight in a case involving a murder planned in advance). Hooper had a long adult criminal history, which started at age eighteen and progressed from disorderly conduct to much more serious crimes of armed robbery and attempted murder. In rebuttal, the prosecutor could have presented the details of these crimes. The prosecutor could have also emphasized Hooper's damaging statements that he would have killed Redmond and his family for "a couple hundred dollars a person," that he was "better off dead or in the pen because if [he] got out again [he] would probably just kill someone again," and that he "like[s] to shoot people, it doesn't bother [him] a bit." The supplemental PSR stated that a Chicago police officer believed Hooper was a "member of a prison gang/terrorist group called the Royal Family for twelve or thirteen years." Presumably, the State could have presented details about this group and Hooper's connection to the group to further rebut his "good character" and prison behavior evidence.

As for Dr. Heilbronner's neuropsychological evaluation, not only could it have opened the door for the prosecution to retain an expert in rebuttal, *see Pinholster*, 563 U.S. at 201, but also, Dr. Heilbronner's conclusion is speculative. He concluded that Hooper likely had some type of brain impairment at the time of trial but provided no insight into what that impairment could have been, how such an impairment would have affected Hooper, or how it might have been related to the crimes. This type of speculative evidence is insufficient to establish prejudice. *See Atwood*, 870 F.3d at 1064 (noting that speculation that petitioner had a brain dysfunction or disorder was not sufficient to establish prejudice); *Rhoades v. Henry*, 638 F.3d 1027, 1050 (9th Cir. 2011) ("Speculation about potential brain dysfunctions or

disorders 'is not sufficient to establish prejudice.'" (citation omitted)).

Considering the two aggravating factors, both of which carry significant weight, alongside Hooper's insubstantial mitigation evidence, there is no "reasonable probability that, but for [sentencing] counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Because Hooper's trial-level ineffective assistance of counsel claim lacks merit, Hooper's post-conviction counsel, Seplow, was not deficient for failing to raise it, and Hooper cannot show that Seplow was ineffective under *Strickland*. Accordingly, Hooper fails to establish "cause" under *Martinez*, and his claim is procedurally barred.[33]

## 2. Denial of Discovery and Evidentiary Hearing

In the district court, Hooper requested discovery and an evidentiary hearing to support his argument that the procedural default of his ineffective assistance of counsel claim is excused under *Martinez*. He also asked to expand the record to include all the materials attached to his supplemental briefs addressing the *Martinez* issue. The court granted Hooper's request to expand the record. The

---

[33] Though our prejudice analysis construes Hooper's mitigation evidence in his favor, we note that his mitigation evidence on the level of violence in his childhood neighborhoods and the extent of the physical abuse by his father is not consistent. A family member stated that their neighborhoods were not "overly violent." Family members also stated that the whippings by Hooper's father occurred "[n]ot so often," and that Hooper and his siblings "received no punishments" from their parents. The evidence of his history of alcohol use is also ambiguous. Hooper's friend, who knew Hooper in the mid-1970s, stated that Hooper did not have an alcohol problem. Hooper's PSR also stated that Hooper "reportedly denies the abuse of alcohol and drugs."

expanded record included declarations and interviews of potential mitigation witnesses, including the declarations of his medical experts. After reviewing the record, including the newly added materials, the district court determined that discovery and an evidentiary hearing were unnecessary.

"We review the district court's denial of discovery and an evidentiary hearing for abuse of discretion." *Smith v. Mahoney*, 611 F.3d 978, 997 (9th Cir. 2010).

Hooper claims that discovery and an evidentiary hearing would resolve the factual disputes related to whether Woods performed deficiently. This argument is unavailing given our decision that, even assuming Woods performed deficiently, Hooper cannot show "cause" for the procedural default. He also makes the conclusory assertion that "[e]xpert and lay witnesses could show the full extent of the available mitigation case, and explain its significance" at an evidentiary hearing. Hooper, however, does not identify who those witnesses would be, and he makes no claim that their testimony would differ materially from the mitigation evidence that is already in the record.

Hooper also takes issue with the district court's denial of his request to depose the "major actors," including Woods and Seplow, based on Hooper's failure to "allege specific, relevant facts that might be found in the requested depositions." But Hooper does not explain how that determination was an abuse of discretion. And in his briefing to us he fails to allege any specific material facts that would be obtained from the requested depositions and makes no claim that any deposition testimony would be materially different from the mitigation evidence in the record. Indeed, as pointed out by the district court, the record already contains the deposition of Woods and a declaration by Seplow.

Because Hooper fails to show what additional evidence he could have obtained from discovery or an evidentiary hearing to support that he was prejudiced by Woods's performance, the district court did not abuse its discretion in denying his requests for discovery and an evidentiary hearing. *See Henry*, 720 F.3d at 1087 (affirming the denial of an evidentiary hearing when petitioner failed to "point to any additional evidence that could be properly pursued at an evidentiary hearing to" support his claim); *see also Runningeagle*, 825 F.3d at 990 (holding that the district court did not abuse its discretion in denying an evidentiary hearing when "[t]he expanded record included the declarations of witnesses who would testify at a live hearing, and Runningeagle made no showing that their testimony would differ materially from their declarations").

## D. Request to Expand the COA

Hooper seeks to expand the COA to include two uncertified claims: (1) the trial court's decision to shackle him was unconstitutional because it was not based on an individualized determination or justified by an essential state interest, and (2) the unconstitutional shackling caused him to involuntarily waive his right to be present at voir dire because he was forced to choose between two constitutional rights—the right to appear before the jury free of restraints and the right to be present at jury selection.

Under AEDPA, a COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In determining whether Hooper has met this standard, "[w]e look to the District Court's application of AEDPA to [Hooper's] constitutional claims and ask whether that resolution was debatable amongst jurists of reason." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

The Arizona Supreme Court considered and rejected Hooper's uncertified claims on direct appeal. *Hooper*, 703 P.2d at 487–88. The Arizona Supreme Court found that the trial court did not abuse its discretion in ordering Hooper shackled given that he had been convicted of three murders in Illinois and was under three death sentences for those murders. *Id.* at 487. It also found that the restraints were not visible to the jury. *Id.* Because Hooper had been properly restrained, the court determined that "he was not denied his right to be present when he voluntarily chose to be absent during voir dire." *Id.* at 487–88.

The district court deferred to the Arizona Supreme Court's finding that the jury did not see Hooper's shackles. The district court then determined that the Arizona Supreme Court's ruling on the unconstitutional shackling claim was not contrary to or an unreasonable application of clearly established law. It also rejected, under AEDPA, Hooper's claim that the alleged unconstitutional shackling order caused him to waive his right to be present at voir dire.

When the Arizona Supreme Court adjudicated Hooper's unconstitutional shackling claim, there was no clearly established law on "the specific procedural steps a trial court must take prior to [visible] shackling, about the amount and type of evidence needed to justify restraints, and about what forms of prejudice might warrant a new trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005); *see Crittenden v. Ayers*, 624 F.3d 943, 970–72 (9th Cir. 2010) (interpreting *Deck* as confirming that there was no clearly established law regarding any required procedures before shackling a defendant). Because there was no clearly established law that required a trial court to make an individualized determination before imposing shackles, no reasonable jurist could disagree with the district court's conclusion that the

Arizona Supreme Court's decision was not contrary to or an unreasonable application of clearly established law. *See Brewer*, 378 F.3d at 955.

The district court properly deferred to the Arizona Supreme Court's determination that the jury did not see the shackles, as that factual conclusion was not unreasonable. There is no indication in the state court record that any juror saw shackles on Hooper. Indeed, Hooper made no allegation in his brief to the Arizona Supreme Court that the shackles were visible, and his briefs here fail to point to any part of the record that shows a juror saw his shackles.[34] Given the lack of any evidence that the jury saw Hooper's shackles, no reasonable jurist could disagree with the district court's decision to defer to the Arizona Supreme Court's factual finding that the shackles were not visible. *See Dixon v. Ryan*, 932 F.3d 789, 810–11 (9th Cir. 2019) (holding that the state court's factual conclusion that restraints were not visible was reasonable because there was no evidence to the contrary).

Hooper's second uncertified claim that he was forced to choose between two constitutional rights depends on a determination that his shackling was unconstitutional. But that claim necessarily fails because we must defer to the Arizona Supreme Court's decision that his shackling was proper. We therefore conclude that no reasonable jurist

---

[34] Hooper provides a 1992 affidavit signed by Bracy to support his claims. We cannot consider this affidavit because it was not part of the record on direct appeal. *See Pinholster*, 563 U.S. at 181–82. Even if we were to consider the affidavit, it does not claim that any juror saw Hooper's shackles. Further, even if the affidavit could be construed as raising the possibility that his shackles may have been visible at times, the mere possibility that a juror saw his shackles would not render the Arizona Supreme Court's factual determination unreasonable.

could debate the district court's rejection of Hooper's second uncertified claim.

We deny Hooper's request to expand the COA.

## IV. Conclusion

We affirm the district court's denial of the writ of habeas corpus. Hooper's *Brady* claims are either barred by AEDPA or fail on the merits under de novo review. The district court properly denied Hooper's request for leave to amend his petition to include claims that his death sentence violates the Eighth and Fourteenth Amendments because any amendment would be futile. We also affirm the district court's conclusion that Hooper's ineffective assistance of sentencing counsel claim is procedurally defaulted, and that Hooper fails to show cause under *Martinez* to excuse the default. Finally, we decline to expand the COA.

**AFFIRMED.**